2008 VT 83

## State of Vermont v. Ricky Laprade

[958 A.2d 1179]

No. 07-023

Present: Reiber, C.J., Dooley, Johnson, Skoglund and Burgess, JJ.

Opinion Filed June 13, 2008

*Thomas Donovan, Jr.,* Chittenden County State's Attorney, and *Pamela Hall Johnson,* Deputy State's Attorney, Burlington, for Plaintiff-Appellee.

*Charles Martin* of *Martin & Associates,* Barre, for Defendant-Appellant.

¶ 1. **Reiber, C.J.** Defendant Ricky Laprade appeals his convictions for first-degree aggravated domestic assault, 13 V.S.A. § 1043(a)(1), and unlawful trespass, 13 V.S.A. § 3705(d). Defendant contends that the trial court violated the Vermont Rules of Evidence and denied him his right to a fair trial by admitting

evidence of his prior abuse of the domestic-assault victim and his conviction for domestic abuse. He also argues that the court erred in admitting expert testimony regarding battered woman syndrome (BWS) without a proper foundation for its relevance. We affirm.

¶ 2. On June 14, 2004, defendant's former girlfriend, C.B., called the police and claimed that defendant had just entered her apartment without permission and strangled her with a cord while she lay sleeping. C.B. managed to escape and called the police. When the police responded, they did not find defendant. He was ultimately apprehended four days later, when the police discovered him in some bushes about one hundred yards from C.B.'s apartment.

¶ 3. Before trial, the State filed a notice of its intent to introduce evidence of several prior bad acts involving defendant and C.B. See V.R.Cr.P. 26(c) ("When the state in a criminal action intends to offer evidence of other criminal offenses under Rule 404(b) of the Vermont Rules of Evidence, . . . [it] shall furnish to the other parties . . . a written statement of the acts or offenses it intends to offer . . . ."). The State took the position that "these prior incidents of abuse are admissible at trial pursuant to the holding in *State v. Sanders*, 168 Vt. 60, [716 A.2d 11] (1998)." Specifically, the State quoted *Sanders* for the proposition that the prior acts were relevant because "[w]ithout knowing the history of the relationship between the defendant and the victim, jurors may not believe the victim was actually abused, since domestic violence is 'learned . . . controlling behavior aimed at gaining another's compliance' through multiple incidents." (quoting *id.* at 62, 716 A.2d at 13) (internal citation omitted).

¶ 4. First, the State proposed to introduce evidence of an incident on June 11, 2004, when a Burlington police officer responded to a call from C.B. According to the report, the officer responded to a call from a neighbor who reported that defendant was holding C.B. against her will in a bedroom. Upon arriving at the scene, the police officer found C.B. with "red marks near her eyes as if she had been struck in the face" and "scratches and welts on her left arm." C.B. told the officer that defendant had come uninvited into her home and had hit her in the face, but that she would not say so in court. When C.B. asked the officer what she could do to keep defendant away from her, the officer suggested a temporary restraining order (TRO) and drove C.B. to

the police station so she could apply for one. Upon arriving at the station, C.B. had a change of heart and decided to apply for a no-trespass order (NTO) instead of the TRO, because she could get an NTO without writing out the allegations of abuse. The officer then drove C.B. back to her house; as C.B. was walking up the front steps, she abruptly reversed course and returned to the cruiser because defendant was on the porch. The officer then issued the NTO to defendant, who claimed he was there only to retrieve a backpack. Shortly thereafter, C.B.'s then-current boyfriend, P.W., arrived at the house. Defendant "began looking at [P.W.] and told him that they would 'dance' later." The officer advised defendant that this behavior was inappropriate, that defendant was not to call C.B., come to her house, or go to her workplace, and that, if he did, a stalking charge might be pursued. No charges resulted from the June 11 incident.

¶ 5. The second act the State sought to introduce occurred on April 29, 2003 and resulted in defendant pleading guilty to domestic assault on March 1, 2004. On April 29, the police were dispatched to a South Burlington motel where defendant and C.B. were staying, based on a third-party report of a domestic assault in progress. Upon their arrival at the motel, the two officers heard a woman scream from inside Room #37; when they knocked on the door to that room, C.B. opened it and told them she wanted to "leave and go home." She further told the officers that defendant had hit her several times that day, and that she was "used to it by now." She had a large red mark on her neck, and her cheeks and head appeared bruised. At the station, C.B. stated that defendant had strangled her, that he hit her very hard, that he was "extremely jealous," and that "maybe it is her fault that he hits her." Based on the events of April 29, defendant ultimately pled guilty to misdemeanor domestic assault, 13 V.S.A. § 1042, and was sentenced to two to twelve months' imprisonment.[1]

¶ 6. The State also moved to introduce evidence of defendant's "flight/furlough status." That motion averred that defendant was on furlough and was required to report to the Department of Corrections (DOC) on June 11, 2004. Defendant did not do so, and was placed on "[e]scape" status. The State argued that defendant's

---

[1] The State's notice of intent to introduce evidence of prior bad acts also announced the State's intent to introduce evidence that C.B. had told two of her friends repeatedly of abuse by defendant. That evidence is not at issue in this appeal.

furlough status, and the fact that he was on escape status on June 14, should be submitted to the jury as evidence of flight, which "tends to show consciousness of guilt."

¶ 7. After a pretrial hearing on the prior bad acts, the court ruled that the evidence of the April 29 incident was admissible under *Sanders* "to show the context of the relationship between these two people."

¶ 8. Defendant's only defense at trial was that he could not have perpetrated the garroting because he was visiting his children and ex-wife in Barre at the time of the assault. Defendant called two alibi witnesses: his ex-wife and her partner. Both testified that defendant was in Barre on the weekend of June 14, 2004. Defendant's ex-wife also testified, without objection, that he physically abused her during their marriage. She noted that, although she and defendant had divorced, she did not limit his access to their children, except that she would not take them to visit him in jail.

¶ 9. In further support of defendant's claim that he could not have been the assailant, he contended at closing argument that, given his history with C.B., he would have known better than to leave behind the cord. The trial court gave several limiting instructions to the jury, including the following instruction regarding the prior bad acts:

> You were presented with evidence which you may conclude showed that the defendant assaulted [C.B.] on occasions other than the one charged here. This evidence . . . has been offered only for the purpose of showing you the nature of the relationship between [defendant and C.B.].

> Let me tell you what you cannot use the evidence of prior assaults for. One, you cannot use the evidence to conclude that the defendant is a bad person or a person of bad character, and two, you cannot use the evidence to conclude that because the defendant may have assaulted [C.B.] in the past . . . that he [therefore] assaulted her on this occasion.

The jury returned guilty verdicts on the unlawful trespass and aggravated domestic assault charges, and this appeal followed.

## I. Prior bad acts

¶ 10. Defendant contends that the trial court abused its discretion in "allowing the prosecution to introduce evidence of prior bad acts and a prior conviction of [defendant] of domestic assault." It is not altogether clear which specific acts defendant now means to contest. In his "Statement of the Facts and Case," defendant mentions three prior bad acts: (1) the incident on April 29, 2003, which resulted in a domestic-assault conviction on March 1, 2004; (2) defendant's furlough status and violation; and (3) the prior confrontation between defendant and C.B. on June 11, 2004. He also mentions C.B.'s testimony about "unspecified times" when defendant had hit her prior to the charged conduct. The remainder of defendant's brief, however, focuses exclusively on the April 29 incident and offers no specific argument regarding either the June 11 incident, the "unspecified" incidents, or the furlough evidence. Accordingly, any claims of error related to the June 11 incident, the "unspecified" incidents, or defendant's furlough status are waived. V.R.A.P. 28(a)(4); *Johnson v. Johnson*, 158 Vt. 160, 164 n.*, 605 A.2d 857, 859 n.* (1992).

¶ 11. The remaining act that was admitted under Rule 404(b) is the April 29 incident. Defendant now objects to the admission of both "the facts surrounding the conviction" and the conviction itself. Defendant stipulated at trial to the admission of the conviction itself, however, as well as the information.[2] Thus any claim of error as to the admission of the conviction itself was not preserved for appeal. *Id.* Accordingly, we consider only the evidence of the facts underlying the conviction. That evidence consisted of testimony from one of the responding officers, and from C.B.

¶ 12. First, the jury heard testimony from Officer Maxfield, who responded to the 911 call on April 29, 2003. The officer testified that, when she located C.B. at the motel on April 29, C.B. was "emanating fear," had a "red mark underneath her neck," and that C.B.'s cheeks were "very, very flushed . . . to the point that they looked bruised," and that she had "a bruise-like area on her forehead, a little dried blood." Officer Maxfield testified that defendant was at the scene, but offered no testimony about the

---

[2] The information states that defendant "was a person who recklessly caused bodily injury to a household member, [C.B.], by KICKING HER AND PUNCHING HER IN THE FACE, in violation of 13 V.S.A. § 1042."

details of the assault. Defendant did not object to these portions of the officer's testimony. C.B. also testified, albeit minimally, about the facts of the April 29 incident. When asked what happened that day, she testified that defendant had locked her out of their motel room after an argument, and when she "[f]inally got in . . . I don't know, he must have — he hit me and then I fell down." Defendant did not object to this testimony.

¶ 13. Evidence of "other crimes, wrongs, or acts" is not admissible, under the Vermont Rules of Evidence, to prove character in order to show that a person acted in conformity therewith. V.R.E. 404(b). Such evidence is, however, admissible for "other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." *Id.* The list of other purposes in Rule 404(b) is not exhaustive. *State v. Longley*, 2007 VT 101, ¶ 16, 182 Vt. 452, 939 A.2d 1028.

¶ 14. Our review of the trial court's admission of evidence under Rule 404(b), therefore, includes two steps: first, whether the evidence was relevant and material to the cause of action, *State v. Parker*, 149 Vt. 393, 398, 545 A.2d 512, 515 (1988), and if so, whether the evidence was more probative than unfairly prejudicial, see V.R.E. 403; *Parker*, 149 Vt. at 400-01, 545 A.2d at 516-17.

### a. V.R.E. 404(b)

¶ 15. Defendant contends that the trial court erred in determining that the testimony about the April 29 assault was relevant under *Sanders*, 168 Vt. at 62, 716 A.2d at 13. There, we upheld the admission of testimony regarding a domestic-assault defendant's prior uncharged abusive behavior against the victim, because "the evidence was relevant . . . to portray the history surrounding the abusive relationship, providing the needed context for the behavior in issue." *Id.* We found further support for admitting the evidence in our conclusion that the "prior history of abuse gives the jury an understanding of why the victim is less than candid in her testimony and allows them to decide more accurately which of the victim's statements more reliably reflect reality." *Id.* at 63, 716 A.2d at 13. But it is not entirely clear from the opinion in

*Sanders* whether, on the stand, the victim recanted about the charged incident or about the prior, uncharged conduct.[3]

¶ 16. Since *Sanders*, we have revisited the "context" theory in two other pertinent cases. The first, *State v. Hendricks*, involved a domestic-assault charge based on a single incident of violence. The *Hendricks* defendant had a prior conviction for domestic assault involving the same victim. The State sought to introduce evidence of the prior conviction, its surrounding facts, and an uncharged incident in which the defendant had allegedly "assaulted the victim in front of their daughters by beating her head into the ground." 173 Vt. at 138, 787 A.2d at 1275. Citing *Sanders*, we stated that:

> This case presents exactly the circumstances to which the reasoning of *Sanders* applies. The jury was presented with a single act of domestic violence. Defendant asserted that his actions during the incident were in self-defense, and that injuries to the victim occurred either in defending himself or as a result of the victim's previous accidental fall.

*Id.* at 139, 787 A.2d at 1276. We concluded that the evidence was relevant and material " 'to provide the jury with an understanding of defendant's actions on the date in question.' " *Id.* (quoting *Sanders*, 168 Vt. at 62, 716 A.2d at 13).

¶ 17. As noted above, the two concurring Justices in *Hendricks* took different views of what this Court actually held in *Sanders*. Justice Dooley characterized *Sanders* as a narrow opinion, and noted that it was premised in large part on the need for the jury to be presented with adequate evidence to make a fully informed credibility determination when "the victim is not telling all she knows." *Id.* at 145, 787 A.2d at 1280 (Dooley, J., concurring). Justice Dooley also stated that the victim in *Sanders* recanted only about the prior abuse, and that "it would not make sense to

---

[3] Compare *State v. Hendricks*, 173 Vt. 132, 143, 787 A.2d 1270, 1279 (2001) (Dooley, J., concurring) ("In fact, the *Sanders* opinion indicates that the victim recanted only her statements about the prior abuse."), with *id.* at 150 n.3, 787 A.2d at 1284 n.3 (Skoglund, J., concurring) ("My Brother Dooley and I disagree on what was recanted in *Sanders*. The facts of the case make clear that the victim . . . specifically recanted prior statements concerning the charged offense, claiming on the stand that the defendant did not have a knife and denying that she believed he was going to kill her.").

read *Sanders* as allowing evidence of prior bad acts only if the victim recants her statement that the prior bad acts occurred." *Id.* at 143, 787 A.2d at 1279 (Dooley, J., concurring).

¶ 18. Justice Skoglund, writing separately, also concurred in the result, noting that the prior bad acts evidence was properly admitted in *Hendricks* to rebut the defendant's self-defense claim. She also agreed that "[i]n certain circumstances, it would be unfair to allow the jury to evaluate the victim's credibility — for example, when the victim has acted in a manner seemingly at odds with the claim of abuse — without full knowledge of the dynamics of the relationship between the accuser and the accused." *Id.* at 147, 787 A.2d at 1282. But *Hendricks*, she went on to state, was not that case: the victim had not "recanted her complaint of abuse, refused to testify, or behaved in a way that made her claim of assault seem incongruous." *Id.* at 149, 787 A.2d at 1283. Justice Skoglund also contended that the *Sanders* victim had recanted as to both the prior bad acts and the charged conduct. *Id.* at 150 n.3, 787 A.2d at 1284 n.3.

¶ 19. We recently relied on *Sanders* once again, concluding that evidence of prior assaultive conduct against the same victim was relevant in a trial for first-degree domestic assault. *Longley*, 2007 VT 101, ¶ 17. In that case, we affirmed the trial court's decision to admit, under Rule 404(b), evidence of the defendant's "prior assault, threats, and stalking of the complainant" as probative of both context and motive. *Id.* ¶ 19.

¶ 20. We conclude that the prior bad acts evidence admitted here was relevant to show context under the facts of this case. C.B. testified at trial that, although defendant had hit her "[a] lot" during their relationship, she had never reported the conduct to the police. She testified specifically about three separate incidents in hotels where defendant had hit her, and defendant did not object to the testimony. C.B. then testified — also without objection — that, despite the ongoing violence, she paid both for the hotel stays and for her own apartment. She further testified that she bailed defendant out of jail after the April 29 arrest because she "felt bad" for him and "felt sometimes it was [her] fault too" because "[m]aybe [she] aggravated too much." C.B. then testified that, after the June 11 incident, she "really didn't want [defendant] to go to jail" because "he was already in trouble."

¶ 21. Moreover, in the course of questioning about the charged incident, C.B. made clear that she had never before notified the

police of defendant's violence against her, although "[e]verybody else did." C.B. also stated that she only called the police after the strangling because she thought that "this time [she] was going to die." C.B.'s testimony was that defendant — still at large for several days — engaged in stalking-like behavior after the charged incident. C.B. testified that, between the charged incident and defendant's arrest four days later, she saw "him outside or he would yell or he'd say let me in, let me in." C.B., however, did not call the police, but rather told her landlord to do so if defendant came around the apartment again. Defendant did not object to this testimony.

¶ 22. C.B.'s testimony, as noted, was generally unequivocal about the details of the charged incident. This is not a case of a victim directly recanting her testimony about the charged conduct. What is clear from the record, however, is that the jury might well have found C.B.'s behavior — particularly her decision not to call the police herself when she repeatedly saw defendant near her apartment after the charged incident — incongruous or difficult to reconcile with her claim that defendant had recently broken into her apartment and strangled her. This is just the sort of incongruity that "context" evidence is meant to remedy in domestic-violence cases. The jury would have been unable to make an adequate determination of C.B.'s credibility without hearing further testimony about the nature of her relationship with defendant. Thus, the trial court did not err in concluding that evidence of defendant's April 29, 2003 assault on C.B. was relevant.

### b. V.R.E. 403

¶ 23. Having concluded that the evidence of the prior bad acts was relevant, we turn to the question of whether it was admissible. Because defendant failed to object at trial to the court's failure to balance explicitly the probative value of the evidence against its potential for unfair prejudice, we review the decision on admissibility for plain error only. See *State v. Muhammad*, 2007 VT 36, ¶ 10, 182 Vt. 556, 927 A.2d 769 (mem.) (failure to make timely, specific objection to admission of evidence means that this Court reviews only for plain error). When the admission of prejudicial evidence is claimed to be plain error, the appellant must show that the judgment below was substantially affected by

its admission. *State v. Burgess*, 2007 VT 18, ¶ 17, 181 Vt. 336, 917 A.2d 528. Defendant has not made that showing here.

¶ 24. The trial court did not err in admitting the testimony about the details of the April 29 assault. The testimony, as noted, was brief and was no more inflammatory than the information itself, to which defendant stipulated. The information stated that defendant "was a person who recklessly caused bodily injury to [C.B.], by KICKING HER AND PUNCHING HER IN THE FACE, in violation of 13 V.S.A. § 1042." By comparison, the testimony about the April 29 assault was innocuous: C.B. testified that "I don't know, he must have — he hit me and then I fell down." Officer Maxfield testified that C.B. was "emanating fear," had a "red mark underneath her neck," that C.B.'s cheeks were "very, very flushed . . . to the point that they looked bruised," and that she had "a bruise-like area on her forehead, a little dried blood." The officer did not testify at all about what caused C.B.'s injuries. The prejudice resulting from this testimony was minimal at worst. Accord *Longley*, 2007 VT 101, ¶ 21 ("Indeed, this evidence was relatively dull compared to the fairly damning evidence already heard and seen by the jury . . . .").

¶ 25. As noted above, the testimony was highly probative of the context of the relationship between defendant and C.B., and did not raise the specter of unfair prejudice that could have resulted from testimony regarding other victims of abuse. See *State v. Anderson*, 2005 VT 17, ¶ 11, 178 Vt. 467, 868 A.2d 716 (mem.) (evidence of other abuse by defendant against same victim highly probative and not unfairly prejudicial); *State v. Winter*, 162 Vt. 388, 393, 648 A.2d 624, 627 (1994) (same). The trial court did not err in admitting the very limited testimony about the facts surrounding the April 29 assault.

## II. Battered woman's syndrome

¶ 26. Defendant also argues that the trial court erred in admitting expert testimony regarding BWS, because the testimony was not relevant or, even if relevant, was unfairly prejudicial. In admitting the testimony, the trial court ruled that the expert could testify only about the dynamics of abusive relationships generally, and about how victims of abuse typically respond; the court forbade testimony concerning abusers' reactions when victims attempt to leave the relationship, reasoning that such testimony

"may be too prejudicial" and would "go[] over the line." The court further cautioned that the expert should confine her testimony to her general knowledge, and should not comment on the parties or the specific facts of the case. See *State v. Wetherbee*, 156 Vt. 425, 431-32, 594 A.2d 390, 393 (1991) (noting that, when an expert comments directly on witness credibility, it invades the province of the jury to determine the credibility of witnesses and creates a risk that the expert will be seen as a "truth detector"). In this case, the expert testified within the limitations imposed by the court.

¶ 27. The admissibility of expert testimony is specifically governed by Rule 702 of the Vermont Rules of Evidence, and is also subject to the requirements of Rule 403. The question of admissibility is vested to the discretion of the trial court, and we will reverse only for an abuse of that discretion resulting in prejudice. *State v. Verrinder*, 161 Vt. 250, 260, 637 A.2d 1382, 1389 (1993).

¶ 28. We considered the rationales underlying expert BWS testimony at some length in *State v. Swift*:

> As the cases recognize, a victim truly suffering from BWS will, for various complex reasons, act in ways that may seem counterintuitive to the average juror. It is up to the prosecution . . . to recognize the potential for juror confusion and offer appropriate expert testimony on BWS that will help the jury understand an alleged victim's actions. See *State v. Grecinger*, 569 N.W.2d 189, 196 (Minn. 1997) (admitting expert testimony on BWS offered in the state's case-in-chief reasoning that "it could help the jury understand behavior that might otherwise undermine the complainant's credibility").

2004 VT 8A, ¶ 21, 176 Vt. 299, 844 A.2d 802.

¶ 29. The first step in the Rule 403 balancing is to determine the probative value of the disputed testimony. The State argues that, although C.B. did not recant about the strangulation incident, other aspects of her testimony at trial might have been incomprehensible to the jury without the aid of the BWS testimony. Specifically, the State notes that C.B. testified that she remained in the relationship for years despite several prior instances of abuse, that she had never reported the abuse before the strangling incident, and that she had posted defend-

ant's bail after the April 29 incident. We further note that C.B. testified that defendant returned to her apartment after the charged incident but that she did not call the police, instead merely telling her landlord, "if you see him, have him arrested." As was noted above in connection with the prior-bad-acts testimony, this is the sort of superficially inexplicable or puzzling behavior that militates in favor of admitting context evidence. In the circumstances presented here, the testimony was probative of C.B.'s credibility, which jurors might otherwise have thought was undermined by her decision to remain in the relationship for as long as she did, and by her failure to call the police herself after the charged incident.

¶ 30. The State also contends that the BWS testimony was probative, in part, because C.B. "repeatedly professed to not remember and minimized her injuries and [defendant's] abuse" at a pretrial motion hearing. In light of our conclusion that the expert testimony was probative to explain the anomalies in C.B.'s testimony *at trial*, we do not rely on her purported testimonial inconsistencies at the pretrial hearing.

*Affirmed.*