2011 VT 43

## State of Vermont v. Michael J. Myers

[26 A.3d 9]

No. 09-355

Present: Reiber, C.J., Dooley, Johnson, Skoglund and Burgess, JJ.

Opinion Filed April 22, 2011

Motion for Reargument Denied May 18, 2011

*Christina Rainville*, Bennington County Deputy State's Attorney, Bennington, for Plaintiff-Appellee.

*William A. Nelson*, Middlebury, for Defendant-Appellant.

¶ 1. **Skoglund, J.** Defendant appeals a jury verdict finding him guilty of seven charges all resulting from a drunken altercation in which he drove his truck around the complaining witness's lawn and eventually into the complaining witness's home, then drove it at the complaining witness, and finally fled the scene, only to be arrested by the police some time later. He makes a series of related claims on appeal, arguing the trial court erred in: (1) denying his in limine motion to exclude prejudicial evidence; (2) failing to instruct the jury on simple assault as a lesser included offense to the aggravated assault charges; (3) giving the jury a flawed instruction on intent, which violated his federal due process rights; (4) neglecting to instruct the jury on his diminished capacity with regard to the aggravated assault charges; (5) refusing to instruct the jury on the necessity defense in connection with the charge of leaving the scene of an accident; (6) allowing the State to prosecute him on a flawed information; and

(7) denying his motion for judgment of acquittal on one of the charges of aggravated assault. We affirm.

¶ 2. Defendant started the evening of March 4 by drinking a half liter of vodka. By about 11:00 pm a friend described his intoxication level as a nine out of ten. The friend declined to let defendant into his house and sent him on his way. Defendant then drove to the complaining witness's home. Testimony differs as to exactly what transpired at the complaining witness's mobile home, but the basic facts are uncontested. Defendant had known the complaining witness for about six months and had previously stopped by his home on multiple occasions. The complaining witness worked as a tattoo artist, and defendant, in the past, had requested that he rework some of defendant's tattoos. The complaining witness had refused, due to the racist subject matter of the tattoos.

¶ 3. Defendant arrived at the complaining witness's home around 11:30 pm, looking to have another drink. The complaining witness, his girlfriend, and their daughter were all asleep when defendant arrived. The complaining witness went out onto his deck to see what defendant wanted. Observing that defendant, who was walking towards the mobile home, was clearly drunk, the complaining witness asked him to leave. Defendant got back into his truck but did not leave. Instead he sat in the truck listening to music at a high volume. Eventually, the complaining witness told him he was trespassing and was "not welcome here." At this point, the exchange rapidly became more heated, and defendant got out of his truck and approached the complaining witness, who was still on the deck of the mobile home. The complaining witness then threatened to shoot defendant if he did not leave. He went inside his home and got a steak knife. He did not own a gun. When he came back outside, defendant was driving his truck around on the driveway and lawn.

¶ 4. The two exchanged more threats — defendant from the cab of his truck and the complaining witness out in his yard — and at some point defendant drove over the complaining witness's mailbox. Eventually, defendant rammed the truck into a corner of the mobile home where the complaining witness's two-and-a-half-year-old daughter slept, causing considerable damage and knocking the home off its foundation. After hitting the home, defendant backed the truck up and, in leaving the property, drove toward the complaining witness. He missed him and then drove approximately a mile to his mother's house.

¶ 5. Meanwhile, the complaining witness's girlfriend had called the police, who arrived at the home shortly after defendant had left. While the police were on the scene, defendant called the complaining witness, threatening him further. During the call, the complaining witness had one of the officers speak to defendant. At the same time, other officers had located defendant's truck at his mother's house and had followed footprints leading from the truck to a locked camper in the woods where they found defendant. They arrested him without incident, handcuffed him, and walked him towards their cruisers. This took place approximately one half hour after defendant left the complaining witness's house. As they approached the cruisers, defendant began shouting and struggling against the officers. Conditions were icy; footing was slippery. The officers testified that while attempting "to regain control of [defendant]" because he "was struggling so violently," one of them tripped and fell, jamming three fingers on his hand. When defendant calmed down, the officers put him in a patrol car. Once in the car, defendant again began to swear and struggle, and he kicked a second officer several times in the leg, knocking the officer backward. The officers brought defendant to the police station, and one officer noted that defendant was intoxicated enough that he was "having some difficulty standing up" while in the holding cell. On the processing report for defendant's driving under the influence charge, the officer indicated defendant had the highest level of intoxication.

¶ 6. Based on the foregoing, defendant was charged with eleven different crimes.[1] Before trial, defendant moved to exclude evidence of events that took place prior to his arrival at his friend's house. Specifically, the State sought to introduce testimony that defendant had been in a local bar where he got into an argument with another patron. The bartender separated the two and asked defendant to leave. Defendant wanted the evidence from the bar excluded because during the course of the interaction the two men discussed defendant's beliefs about racial supremacy. The interaction grew heated when defendant learned of the patron's mixed racial background and allegedly called the patron a "spic." Defendant argued that evidence of the event would be prejudicial

[1] The State dismissed a charge of felony unlawful mischief, causing damage to property with a value greater than $1000, under 13 V.S.A. § 3701(a), before the trial.

because of its racist content and had no probative value because it was irrelevant to the charges. The prosecution opposed the motion arguing that the evidence would show defendant's consumption of alcohol a short time before the incident, discussion of his racists beliefs, and an angry argument between defendant and the patron. In denying the motion, the trial court ruled that evidence from the bar was relevant as "highly probative" on the issues of defendant's motivation and intent in committing the later crimes. On this point the court held "any racist statements defendant made tend to cast light on his motive to be violent with [the complaining witness], whom — according to the State's version of the facts — defendant knew has a daughter whose godfather is black." The court agreed that the evidence would be somewhat prejudicial, but it judged the events at the bar to be sufficiently relevant and probative because they were part of the res gestae of the charged crimes, meaning they "form[ed] a body of evidence relating to the events surrounding the crime of which a defendant is charged." *State v. Maduro*, 174 Vt. 302, 306, 816 A.2d 432, 435 (2002) (quotation omitted).

¶ 7. In March 2006, the case was set for a jury draw. During voir dire, apparently in response to the judge's denial of the motion in limine, the defense attorney discussed with the jury defendant's racist beliefs to assess potential bias against him. He told the jury panel that defendant was a "white supremacist." Due to the defense attorney's health, the case did not go to trial with this first jury pool, and the parties were forced to draw a second jury. Because some of the original jurors who learned of defendant's beliefs would be in this second draw, the defense attorney again believed it necessary to discuss defendant's racist beliefs during voir dire. During a conversation with the court before the jury draw, the State asserted that its case was "just . . . not about white supremacy." The trial judge noted that reraising this issue was "a difficult decision tactically [for the defense attorney], so . . . whether or not you do it is completely your election. It's not compelled by anything that's obvious in the State's presentation of how it intends to proceed." After the defense attorney brought up white supremacy during voir dire, the court dismissed several jurors who said they could not be impartial to defendant based on his beliefs.

¶ 8. During the trial, the issue of defendant's beliefs came up several times. Both attorneys brought it up during their opening

statements. The bar patron was unavailable to testify for the State; however, the bartender testified that defendant had gotten in an argument and called the patron a "spic." The complaining witness also testified to the fact that many of the tattoos defendant wanted him to rework were Aryan Brotherhood and Nazi tattoos. The complaining witness stated that he refused to work on such tattoos because he "didn't believe in what the tattoos stood for" and because his "daughter's godfather is black." Finally, defendant took the stand, and the defense attorney elicited testimony from defendant related to his "sacrodist" or racial purist religious beliefs.

¶ 9. At the close of the State's case, defendant moved for a judgment of acquittal. The court denied the motion, and after defendant presented his case, the parties met to discuss the jury instructions. Defendant raised several concerns about the instructions, requesting a necessity defense instruction for the leaving-the-scene-of-an-accident charge and an instruction on simple assault as a lesser included offense to the charges of aggravated assault. The court denied the requests. After instructing the jury, the trial judge had a bench conference and asked:

THE COURT: Any objections to the charge as given?

[THE STATE]: No.

[DEFENSE COUNSEL]: Other than what we talked about in the charge conference, the answer is no.

THE COURT: All right. Then thank you. . . . On that representation, I will put on the record, at least, that I do have in mind all of the matters that were articulated during the charge conference, and I think they were made quite clearly at that time, and I'm going to rely on the rulings that I made at that time to preserve any other objections.

¶ 10. The jury convicted defendant of: reckless endangerment, 13 V.S.A. § 1025; unlawful trespass, 13 V.S.A. § 3705(a); leaving the scene of an accident with property damage resulting, 23 V.S.A. § 1128(a); driving under the influence (DUI), third offense, 23 V.S.A. § 1201; two counts of aggravated assault, preventing a law enforcement officer from performing a lawful duty, 13 V.S.A. § 1024(a)(4); and resisting arrest, 13 V.S.A. § 3017(a). They acquitted him of assault with a deadly weapon (his vehicle) against the

complaining witness, attempted murder, and misdemeanor unlawful mischief. He appeals.

¶ 11. Defendant's claims before this Court fall into three categories. First, he takes issue with the trial court's ruling on his in limine motion to exclude evidence of his argument at the bar wherein his racist beliefs were revealed. Second, he assigns error to the jury instructions on several grounds. Finally, he makes two additional arguments contending that the information charging him with reckless endangerment was unconstitutionally vague and that the trial court erred in denying his motion for judgment of acquittal on one of the aggravated assault charges. We affirm defendant's convictions.

I.

¶ 12. Defendant claims that evidence demonstrating his particular beliefs on racial superiority could prove prejudicial. We do not contest this point, but recognize that in this trial, the court's denial of defendant's motion to exclude evidence was not error and resulted in only one minor addition to the evidence illustrating defendant's racial beliefs presented by his tattoos and testimony. Moreover, we find no merit in defendant's claim that the court's ruling on the in limine motion forced his hand and required him to relay his beliefs to the jury during voir dire.

¶ 13. In ruling on admission of evidence in the face of claims of irrelevance and prejudice, trial courts rely on Vermont Rules of Evidence 401 and 403. See V.R.E. 401 (defining relevant evidence as "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence"); V.R.E. 403 (permitting exclusion of otherwise relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice"). On appeal, defendant argues only that the trial court's ruling on his motion to exclude violated Rule 403.[2] We review such evidentiary determinations deferentially, recognizing that the trial court is in the best position to determine admissibility in the first instance, and we reverse only on a showing of prejudice. See *State v. Hill*, 174 Vt. 566, 566-67, 816 A.2d 440, 442-43 (2002) (mem.) (reviewing Rule 403 decision under abuse of discretion standard).

---

[2] To the extent defendant suggests a heightened balancing of prejudice versus probative value under Rule 403 when evidence involves racial beliefs, neither the case law he cites nor the facts of this case support his position.

¶ 14. This is a close question. Based on the information before it, the court concluded that evidence regarding defendant's visit to the bar was relevant, relying on the fact that defendant acted aggressively toward the patron, the incident was close in time to the charged crimes, and the evidence showed that defendant was under the influence of alcohol at the time of the charged crimes, one of which was DUI. In weighing the admissibility of this evidence under Rule 403, the court took note of the fact that it carried with it "some prejudice," but said prejudice did not substantially outweigh its probative value. Further, the court rightly recognized that to tip the Rule 403 scale on prejudice, the primary purpose of the evidence must be to "provoke horror or punish the defendant, or to appeal to the jury's sympathies." *State v. Kelley*, 163 Vt. 325, 329, 664 A.2d 708, 711 (1995). While evidence of defendant's use of a racial epithet may have troubled the jury, that was not its primary purpose. The evidence of defendant's presence at the bar focused on his high level of intoxication and his aggressive interaction with another patron. We do not find the trial court abused its discretion and defer to its authority on this matter. See *State v. Hinchliffe*, 2009 VT 111, ¶ 29, 186 Vt. 487, 987 A.2d 988 (noting that "although this information was prejudicial to defendant," its admission "gave the jury further context for evaluating" the case and did not unduly prejudice defendant). Defendant's reliance on the prejudicial effect of a criminal defendant's racist beliefs in sentencing cases does nothing to persuade us.

¶ 15. We pause to note, however, that defendant's claim highlights a potential problem in ruling with finality on in limine matters. As we wrote in *State v. Williams*, "we take the opportunity to point out the pitfalls in granting such broad pretrial motions, and to underscore the advantages of either deferring a ruling until trial or, at a minimum, establishing a clear basis for deciding the issue in advance." 2010 VT 77, ¶ 11, 188 Vt. 405, 9 A.3d 315. Here, the court ruled, in part, that the racial evidence was relevant because defendant's racist beliefs provided a potential motive for his crimes against the complaining witness. Ultimately, the State did not adopt this attenuated theory of the case, thus rendering defendant's specific use of a racial epithet in the bar irrelevant.

¶ 16. Even if we viewed this pretrial ruling as error, any such error was harmless. Testimony about defendant's actions at

the bar was but a small part of the evidence admitted at trial on defendant's racist credo — the nature of his tattoos and the complaining witness's refusal to work on them were part of the State's case, regardless. The defense attorney recognized that the subject of defendant's tattoos would arise during the trial and chose to make the jury aware of their essence during voir dire. The issue came up again during cross-examination of the complaining witness, and the defense attorney brought it out during his examination of defendant. One racial slur adduced from the altercation at the bar was insignificant in light of the testimony about defendant's tattoos and personal values. See *State v. Laprade*, 2008 VT 83, ¶ 24, 184 Vt. 251, 958 A.2d 1179 (holding that prejudice from additional testimony about crime "was minimal at worst"). Though defendant argues that much of this information came into the trial as a result of the court's early ruling, this conclusion is belied by the fact that defendant knew evidence of his tattoos was already coming in. He cannot claim prejudice for his own tactical decisions. Cf. *State v. Koveos*, 169 Vt. 62, 71, 732 A.2d 722, 728 (1999) (refusing to relieve defendant "of the results of his tactical decision" to avoid certain testimony based on a pretrial evidentiary ruling).

II.

■ ¶ 17. Defendant's next set of arguments revolves around the instructions given to the jury. Before delving into each claim, we must establish the appropriate standard of review. Under Vermont Rule of Criminal Procedure 30, to preserve an objection to a jury instruction for appellate review, a party must object "before the jury retires to consider its verdict" and must "stat[e] distinctly the matter to which [the party] objects and the grounds of [the] objection." V.R.Cr.P. 30. We have explained the "primary reason for the rule is to give the trial court one last opportunity to avoid an error." *State v. Wheelock*, 158 Vt. 302, 306, 609 A.2d 972, 975 (1992). We have held fast to the position that absent a specific objection — after the judge reads the charge but before the jury retires — we review any appealed instructions for plain error. *State v. Rounds*, 2011 VT 39, ¶ 19, 189 Vt. 447, 22 A.3d 477. Indeed, since deciding *Wheelock*, we have chosen to stray from this rule on only one occasion. See *State v. Bacon*, 163 Vt. 279, 284-85, 658 A.2d 54, 59 (1995) (reviewing objection to jury instructions as preserved even though no objection made after charge given to jury).

■ ¶ 18. Given defendant's failure to make a detailed objection to the instructions before the jury recessed, he relies on *Bacon* to support his claimed preservation. This aspiration is untenable — *Bacon* has some similarities with the procedural posture of this case but is ultimately unique. As in this case, after the charging conference in *Bacon* and before the jury retired, defendant did not restate his objection per Rule 30, and the trial court assured counsel that it was preserving all earlier objections. We treated the defendant's objection in *Bacon* as preserved because, in the interest of fairness, our decision in *Wheelock*, which clarified Rule 30's demands, had issued only two weeks before the trial in *Bacon* took place and because the defendant had continually raised the objection from pretrial to the charging conference; it was "the focus and the heart of his principal defense at trial." 163 Vt. at 285, 658 A.2d at 59. The timing and multiple attempts at preservation that made *Bacon* an anomaly are not present here. Thus, we affirm what we said in *Bacon*: "in the future parties may not rely on the trial court's advice that all objections raised at the charge conference will be preserved." *Id.* at 286, 658 A.2d at 60. We will therefore review all of defendant's claims regarding the jury instructions for plain error. See *Rounds*, 2011 VT 39, ¶ 31 (explaining plain error standard for jury instructions); see also V.R.Cr.P. 52(b) (defining plain error).

■ ¶ 19. Defendant first suggests that the trial court erred in failing to instruct the jury on simple assault as a lesser included offense to the two aggravated assault charges, which were based on his preventing a law enforcement officer from performing a lawful duty. A defendant is entitled to a jury instruction on a lesser included offense when the evidence supports it. *State v. Delisle*, 162 Vt. 293, 301, 648 A.2d 632, 637 (1994); see also V.R.Cr.P. 31(c) ("The defendant may be found guilty of an offense necessarily included in the offense charged . . . ."). An offense is considered lesser included when "it is composed of some, but not all, elements of the greater offense and does not have any element not included in the greater offense." *State v. Forbes*, 147 Vt. 612, 616-17, 523 A.2d 1232, 1235 (1987).

■ ■ ¶ 20. Here, the trial court was correct in recognizing an important distinction between the elements of the crime of aggravated assault, as charged, and those of simple assault. Defendant was charged with aggravated assault under 13 V.S.A.

§ 1024(a)(4), which requires the State to prove a person "causes physical injury to any person" when acting "with intent to prevent a law enforcement officer from performing a lawful duty." Simple assault, under 13 V.S.A. § 1023(a), also requires proof of a "bodily injury to another," but the defendant must act "purposely, knowingly or recklessly" in causing the injury. The difference between the two lies in the required mental state: intent to prevent in the aggravated assault charge and intent to harm — or doing so knowingly or recklessly — for simple assault. Because the requisite mental element is different for each charge, simple assault is not a lesser included element of aggravated assault as charged and omitting an instruction on simple assault was not error.

¶ 21. Defendant next argues that the trial court gave the jury an erroneous instruction that violated his federal due process rights by creating a mandatory presumption against him. In instructing the jury on the intent element of the two aggravated-assault-preventing-a-police-officer charges, the court explained:

> A person acts *intentionally* if he or she acts purposefully and not inadvertently because of mistake or by accident. You may find that the defendant acted intentionally if it was his conscious objective to prevent the law enforcement officer from performing a lawful duty.
>
> *The law presumes that unless there is some other reasonable explanation, a person may be presumed to have intended the consequences of his actions that might be normally expected.* Since it is not possible to know exactly what is in another person's mind, in determining defendant's intent, you should consider all of the surrounding facts and circumstances as established by the evidence.

(Second emphasis added.) Defendant takes issue with the emphasized sentence above. While we agree that the instruction created a mandatory inference, we do not find it to be plain error.

■ ■ ¶ 22. We have ruled that mandatory inferences, whether they impermissibly shift the burden of proof to the defendant or remove determination of an element of the crime from the jury, likely constitute reversible error. See *State v. Martell*, 143 Vt. 275,

279-80, 465 A.2d 1346, 1348 (1983).[3] Determining "[w]hether an instruction is mandatory or permissive hinges on 'the way in which a reasonable juror could have interpreted' it." *State v. Dusablon*, 142 Vt. 95, 98, 453 A.2d 79, 81 (1982) (quoting *Sandstrom v. Montana*, 442 U.S. 510, 514 (1979)). This requires that we "give careful attention to the words actually spoken to the jury." *Id.* (quotation omitted). In reviewing a jury charge for error, we examine it as a whole to ensure that it "breathes the true spirit of the law" and that "there is no fair ground to say that the jury has been misled." *Id.* (quotation omitted).

¶ 23. As our standard of review is an objective one, we look to case law interpreting similar jury provisions for guidance. The United States Supreme Court, in *Sandstrom v. Montana*, determined that a similar jury instruction created a mandatory inference. 442 U.S. at 519. The instruction at issue there read, "the law presumes that a person intends the ordinary consequences of his voluntary acts." *Id.* at 512. The Court recognized that this instruction did not inform the jury "that they had a choice, or that they might infer that conclusion; they were told only that the law presumed it," and as such "a reasonable juror could easily have viewed such an instruction as mandatory." *Id.* at 515. The Court went on to highlight the fact that the jury was "not told that the presumption could be rebutted . . . by the defendant's simple presentation of 'some' evidence; nor even that it could be rebutted at all." *Id.* at 517. On the issue of rebuttal, the Court also noted that though the instructions had mentioned the presumption of innocence and the State's burden of proof beyond a reasonable doubt, these other instructions were not "rhetorically inconsistent with a . . . burden-shifting presumption" because the jury could have "interpreted the two sets of instructions as indicating that the presumption was a means by which proof beyond a reasonable doubt as to intent could be satisfied." *Id.* at 518 n.7. The Court reversed the defendant's conviction in light of the flawed instruction. *Id.* at 527.

¶ 24. On the heels of *Sandstrom*, we upheld a similarly worded instruction in *State v. Dusablon*. 142 Vt. at 99, 453 A.2d at 82. The trial court in *Dusablon* instructed the jury: "It is ordinarily reasonable to infer that a person intends the reasonable and

---

[3] Though *Martell* held that use of a mandatory inference was reversible error per se, we overrule that holding. See *infra*, ¶ 28.

probable consequences of an act knowingly done or knowingly committed." *Id.* at 97, 453 A.2d at 80. Reading the jury charge as a whole, we recognized the trial court had highlighted that the only evidence as to the defendant's intent was circumstantial, had instructed the jury that the State "must by law exclude every reasonable hypothesis consistent with innocence,"[4] had clarified the permissive nature of the inference, had mandated that the jury examine the evidence of intent with "strict scrutiny," and finally had told them that "mere suspicion" was not adequate grounds for convicting the defendant. *Id.* at 96-97, 98-99, 453 A.2d at 80-81, 82. Thus, the instruction as a whole "left the trier of fact with the freedom to accept or reject the inference." *Id.* at 99, 453 A.2d at 82.

¶ 25. Less than a year after *Dusablon*, we struck down an instruction in *State v. Martell* that read:

> The State must show beyond a reasonable doubt that the defendant broke and entered into this dwelling house with the intent to commit larceny and the essential aspect of this element is the defendant's intent or state of mind. The question of the defendant's intent is one for you the jury to consider based on all the circumstances brought before you during the course of this trial. *Under the law a person is presumed to intend the natural and probable consequences of his acts.* And you as jurors must look into all the circumstances surrounding the offense in order to establish whether the defendant engaged in the acts alleged with the intent to commit a larceny, and if you so find beyond a reasonable doubt then the State has met its burden of proof as to that element.

143 Vt. at 278, 465 A.2d at 1347. Recognizing that the instruction, specifically the emphasized passage, was nearly identical to the one the United States Supreme Court had struck down in *Sandstrom*, we relied on that holding to conclude that the instructions in *Martell* created a mandatory inference against the defendant. *Id.* at 278-79, 465 A.2d at 1347.

---

[4] The necessity of this portion of a jury instruction was repudiated as inconsistent with the State's burden of proof beyond a reasonable doubt. *State v. Derouchie*, 140 Vt. 437, 445, 440 A.2d 146, 150 (1981).

¶ 26. Turning to the instruction at issue here, we find it is closer to those in *Martell* and *Sandstrom* than those in *Dusablon*, and so it constitutes error. On its face, the contested sentence is garbled. Whether the jury understood it at all is unknown. Simplified, it suggests that, absent an alternative reasonable explanation, under the law the jury may presume defendant's intent based on "the consequences of his actions that might be normally expected." The instruction raises two distinct concerns, which result in our determination that it created a mandatory inference and impermissibly shifted the burden of proof to defendant. The first is that, notwithstanding the use of the permissive "may," nothing in the body of the instruction or the entirety of the jury charge suggests that the jury had a choice about whether to accept or reject this presumption, nor were they informed that the law's presumption could be rebutted. Cf. *Sandstrom*, 442 U.S. at 515 (noting jury was not informed they "had a choice" in accepting or rejecting inference regarding "ordinary consequences"). Express choice for the jury is the hallmark of a permissive inference. See *Dusablon*, 142 Vt. at 99, 453 A.2d at 82 (highlighting fact that instruction "plainly directed the jury to consider all of the circumstances tending to support or contradict the inference" and directing jury "to decide the matter for itself"). Here the language at issue is directive: "The law presumes that unless there is some other reasonable explanation, a person may be presumed to have intended the consequences of his actions that might be normally expected." The addition of the proviso "unless there is some other reasonable explanation" cements the matter. Rather than making clear that the prosecution "had to still prove that there was no 'other reasonable explanation,' " as the State argues, this language at best suggests some burden of proof less than our reasonable doubt standard and at worst requires defendant to provide the "other reasonable explanation" to rebut the inference — assuming the jury knew it was rebuttable at all. Indeed, "a review of the [whole] charge in this case reveals nothing 'rhetorically inconsistent with a conclusive or burden-shifting presumption.' " *Martell*, 143 Vt. at 278, 465 A.2d at 1347 (quoting *Sandstrom*, 442 U.S. at 518-19 n.7).

¶ 27. Having established that the instruction was error, we must assess its import. In *Martell*, we held that a mandatory inference in a jury instruction was reversible error per se because it created "a conclusive presumption on an essential element of the crime

charged," thus removing determination of the issue from the jury's purview. 143 Vt. at 279-80, 465 A.2d at 1348. We have since tempered that ruling with our recognition that the creation of "a category of errors which are plain per se" is "bad policy." *State v. Roy*, 151 Vt. 17, 23, 557 A.2d 884, 888 (1989), *overruled on other grounds by State v. Brillon*, 2008 VT 35, 183 Vt. 475, 955 A.2d 1108; see also *State v. Lambert*, 2003 VT 28, ¶ 13, 175 Vt. 275, 830 A.2d 9 (rejecting request to treat omission of element of a crime from jury instruction as plain error per se); *Koveos*, 169 Vt. at 66, 732 A.2d at 725 ("Our recent decisions reflect a strong policy against finding categories of errors as plain per se, such that preservation is not required for appellate intervention.").

¶ 28. We have questioned the foundation of *Martell*'s holding in the past, *State v. Jackowski*, 2006 VT 119, ¶ 26, 181 Vt. 73, 915 A.2d 767 (Burgess, J., dissenting), and have sought to limit its scope. *Jackowski*, 2006 VT 119, ¶¶ 8, 9 n.3 (recognizing reversible error in *Martell* because the instruction at issue "amounted to a directed verdict," but refusing to "foreclos[e] a harmless-error analysis on review of all criminal cases involving a conclusive presumption or the equivalent"). Without dismissing the value of our reasoning in *Martell*, we now expressly overrule it to the extent that it created a category of per se reversible error. As we held in *Roy*, the creation of a per se category of error would both limit the value of Rule 30 and "reduce any incentive for trial counsel to object to errors" in the jury instruction and so hinder a trial court's ability to correct such errors in the first instance. 151 Vt. at 23, 557 A.2d at 888.

¶ 29. Accordingly, we assess this error under the familiar plain error standard. See V.R.Cr.P. 52(b) (defining plain error as those "defects affecting substantial rights"). We reverse such error when it is obvious, affects substantial rights bringing prejudice to the defendant, and "seriously affects the fairness, integrity or public reputation of judicial proceedings." *Rounds*, 2011 VT 39, ¶ 31 (quotation omitted). We affirm when the error is harmless. *State v. Kulzer*, 2009 VT 79, ¶ 16, 186 Vt. 264, 979 A.2d 1031.

¶ 30. Use of a mandatory inference against a defendant in a jury instruction has long been disfavored in this state and has constituted grounds for reversal of conviction in the past. See, e.g., *State v. Young*, 143 Vt. 413, 415, 465 A.2d 1375, 1376 (1983) (noting "a mandatory presumption here would impermissibly act

to shift the burden of producing evidence from the State to the defendant"); *Martell*, 143 Vt. at 279-80, 465 A.2d at 1348. It is a tenet of our nation's law that the State holds the burden of proving every element of a crime beyond a reasonable doubt and shifting that burden from the State to the defendant violates due process. See, e.g., *Dusablon*, 142 Vt. at 97, 453 A.2d at 81 ("The due process clause of the Fourteenth Amendment requires that the state prove every element of a crime charged beyond a reasonable doubt. It violates due process to shift the burden of proof on an essential element from the state to the defendant." (citing *In re Winship*, 397 U.S. 358, 364 (1970), and *Patterson v. New York*, 432 U.S. 197, 215 (1977))). A mandatory inference has no place in a criminal trial. See *State v. Koons*, 2011 VT 22, ¶ 13, 189 Vt. 285, 20 A.3d 662 (noting plain error must be "one that is clear or obvious under existing law").

¶ 31. Obvious though the error may have been, and though it may have violated a substantial right, the instruction was not ultimately prejudicial. The central danger of a mandatory presumption in a jury instruction is that it can operate like a directed verdict against a defendant, providing him no recourse to combat the State's case. See *Sandstrom*, 442 U.S. at 523; *Jackowski*, 2006 VT 119, ¶ 9 ("[W]e are persuaded that the effect of the erroneous instruction [permitting the jury to ignore any evidence of defendant's intent and to convict solely based on her knowledge] was analogous to a directed verdict for the State."). This danger is diminished, however, when the facts of the case and the specifics of the charge at issue are examined more closely. Simply put, the question of why defendant lashed out at the officers was never at issue. The State's evidence centered on defendant physically struggling with the arresting officers and trying to pull away while yelling at them to let him go. Defendant raised only the issue of whether the officers were actually injured by him and the degree to which his actions delayed the arrest. The jury was instructed that it could find he acted intentionally "if it was his conscious objective to prevent the law enforcement officer from performing a lawful duty." *Supra*, ¶ 21. Indeed, the jury found him guilty of resisting arrest beyond a reasonable doubt. See 13 V.S.A. § 3017(a) (outlawing "intentionally attempt-[ing] to prevent a lawful arrest . . . , which is being effected or attempted by a law enforcement officer"). There was no evidence to suggest defendant was struggling or kicking at the officers for

some other purpose. The evidence of defendant's struggle supports the jury finding that he intended to hinder the officers. Though a violation of his constitutional rights, the mandatory presumption portion of the instruction did not prejudice defendant.

¶ 32. Defendant's next claim again focuses on his conviction for these same two charges of aggravated assault. He argues the trial court's failure to include a diminished capacity instruction for these two charges was error in light of his extreme level of intoxication at the time he was arrested. He suggests this error prejudiced his cause because he received a diminished capacity instruction on the charge of attempted aggravated assault and the attempted murder charge, and he was acquitted of both of these crimes. As above, defendant did not raise this objection before the trial court, and we do not find it constitutes plain error.

¶ 33. We have long recognized that voluntary intoxication can provide a defense to certain crimes. See, e.g., *State v. Turley*, 87 Vt. 163, 176, 88 A. 562, 568 (1913) (permitting jury instruction "that dealt with voluntary intoxication as a defence to a criminal charge"). "Where there is evidence of intoxication such as to negate the requisite criminal intent, the court should normally instruct the jury that it may consider the intoxication evidence as bearing on intent." *State v. Kinney*, 171 Vt. 239, 243, 762 A.2d 833, 837 (2000); see *State v. Joyce*, 139 Vt. 638, 639-40, 433 A.2d 271, 272 (1981) ("When specific intent is an element of a crime, evidence of either voluntary or involuntary intoxication may be introduced to show that the defendant could not have formed the necessary intent."). However, "evidence of alcohol or drug consumption, even in large quantities, will not by itself require the court to charge the jury that it can consider defendant's intoxication as bearing on whether he had the requisite intent to commit the crimes charged." *Kinney*, 171 Vt. at 243, 762 A.2d at 838.

¶ 34. Defendant points out that here there is more evidence than simply his consumption of alcohol. He points to the quantity of alcohol he ingested, the officer's report of his "substantial" intoxication while in the holding cell, and the relatively short time frame in which all of these events occurred. In doing so, he likens his cause to *Kinney* where this Court found that "evidence of the amount [of alcohol] consumed, together with the assessment of a

witness that defendant appeared intoxicated on the night in question, and defendant's statement that his faculties were 'fairly clouded,' were sufficient to warrant the charge." *Id.* at 244, 762 A.2d at 838. But in *Kinney* we recognized the issue of the instruction as a close question and ultimately found the preserved error harmless in light of the totality of the evidence. *Id.* We face a different circumstance here.

¶ 35. While the question of whether the evidence produced at trial should have given rise to a diminished capacity instruction is an open one, even were we to assume that the omission both was error and was obvious, we do not find it prejudicial. As noted above, defendant never raised the issue of his intent with regard to the aggravated assault charges. Indeed, he never even raised the matter of intoxication directly when addressing the twin assault charges, only questioning one of the officers about his level of intoxication upon processing his arrest. Contrary to *Kinney,* defendant never testified about his own level of intoxication beyond repeatedly admitting he was aware at the time that he was driving drunk. Defendant's closing argument — not to mention his lack of objection to the charges as given — solidify our opinion; his defense to these charges was to suggest that his actions did not delay his arrest or did not actually cause harm to the officers. In contrast, the State spent ample time addressing his aggressive actions toward the officers when they attempted to take him into custody. He struggled, he kicked, he told them to let him go, and the arresting officers testified that his actions made the "entire process [of taking him into custody] . . . difficult." We find no prejudice here.

¶ 36. In response, defendant argues that the true prejudice he suffered from the omitted instruction came about as a result of the diminished capacity instructions provided to the jury in connection with other charges, notably the attempted aggravated assault charge and the attempted murder charge. He makes much of the fact that he was acquitted of these two crimes but not of the aggravated assaults and suggests that the jury "would have understood that diminished capacity could not be a defense for [his] alleged crimes against the arresting officers, although it could be for his [other] alleged crimes." This argument is fruitless. The absence of the desired instruction did nothing to change the facts presented in the case. While upon review of the record there was evidence that defendant was intoxicated at the time of his

arrest, as illustrated above the impact of his intoxication on his mental capacity was never raised, and he never argued this theory to the jury nor even addressed his intent generally. The lack of a diminished capacity instruction did not influence the jury's consideration of defendant's intoxication as a defense. It was his failure to make that argument at all.

¶ 37. Defendant's final claim regarding the jury instructions centers on his unpreserved request for a necessity defense instruction on the charge of leaving the scene of an accident. The law requires a driver involved in an accident causing property damage to "immediately stop and render any assistance reasonably necessary" and "give his or her name, residence, license number" and other information "to any person . . . whose property is damaged and to any enforcement officer" or face criminal sanction for leaving the scene of an accident. 23 V.S.A. § 1128(a). We have held that the immediacy with which a defendant renders aid and provides information is a fact-specific inquiry, but that aid and identification should occur "as soon as reasonably possible." *State v. Severance*, 120 Vt. 268, 274, 138 A.2d 425, 429 (1958); see also *State v. Loso*, 151 Vt. 262, 266, 559 A.2d 681, 684 (1989) (noting 23 V.S.A. § 1128 requires rendering assistance and providing information "at a time and in a manner reasonable under the circumstances"). Based on this reasonableness requirement, defendant argues that the complaining witness here was brandishing what defendant believed was a gun and suggests that stopping immediately to provide information after hitting the complaining witness's mailbox and mobile home could have resulted in tragedy for defendant. He posits that these facts give rise to a necessity defense instruction, permitting the jury to find that it was necessary for defendant to delay giving information to the complaining witness and law enforcement following the accident and thus acquit him of the crime.

¶ 38. The trial court was correct in denying defendant a necessity instruction. In brief, defendant must make a prima facie showing that: (1) there was an emergency situation "arising without fault on the part of the actor concerned"; (2) the emergency was "so imminent and compelling as to raise a reasonable expectation of harm"[;] (3) the emergency presented "no reasonable opportunity to avoid the injury without doing the criminal act"; and (4) harm from the impending emergency was

"of sufficient seriousness to outmeasure the criminal wrong." *State v. Thayer*, 2010 VT 78, ¶ 6, 188 Vt. 482, 14 A.3d 231 (quotations omitted). The first requirement for such an instruction is that the defendant is not responsible for causing the emergency giving rise to the necessity. Here, there is little question that defendant was driving his truck around the complaining witness's property and threatening same, thus creating any "emergency" that existed. That defendant was armed with a truck and the complaining witness had a knife were also circumstances defendant created. See, e.g., *State v. Squires*, 147 Vt. 430, 431, 519 A.2d 1154, 1155 (1986) (per curiam) (affirming trial court's denial of necessity instruction where defendant's intoxication created emergency). He also fails under the third prong because he had ample opportunity to inform the police of the accident and did not do so. Upon leaving the complaining witness's property, defendant drove to his mother's house. He was arrested roughly half an hour later, locked in a trailer on his sister's adjoining property. He had made no attempts to contact the police during this time. In fact, over those intervening thirty minutes, defendant found time to call the complaining witness and at one point during that call even spoke with a law enforcement officer. He never provided either party the information 23 V.S.A. § 1128 requires. Lack of an instruction thus did not constitute error.

### III.

¶ 39. Defendant's final two claims are that the information charging him with reckless endangerment was "constitutionally insufficient" and that the court erred in denying his motion for judgment of acquittal on one of the aggravated assault charges. The first claim is without merit. Though defendant is correct that such a claim can be raised for the first time on appeal, *State v. Neisner*, 2010 VT 112, ¶ 27, 189 Vt. 160, 16 A.3d 597, his suggestion that the information at issue failed in "its basic task of informing a reasonable person of the exact offense charged" is unpersuasive. In assessing the validity of an information, we review it in an objective manner, taking a common sense approach. *Id.* Additionally, we read it in conjunction with any supporting affidavits. *Id.* To succeed in challenging the sufficiency of an information, the defendant must prove that it did not "reasonably indicate the exact offense the accused [was] charged with" and that this lack of precision prejudiced his defense. *Id.*

¶ 29 (quotation omitted). As prosecuted, Count Three of the information charged:

> [Defendant], . . . on or about March 4, 2008, recklessly engaged in conduct which placed or may have placed another person in danger of death or serious bodily injury, in violation of 13 V.S.A. § 1025.

This charge was preceded with charges of aggravated assault with a weapon, specifically his truck; attempted murder of the complaining witness with his truck; unlawful mischief resulting in property damage not exceeding $250; unlawful mischief resulting in property damage greater than $1000; and unlawful trespass on the complaining witness's property.

¶ 40. There can be no serious claim that defendant did not understand the charge he faced, especially in light of the associated affidavits. The language of the information is drawn from the statute and is sufficient on its face to inform defendant of the crime in question. See *State v. Francis*, 151 Vt. 296, 308, 561 A.2d 392, 399 (1989) (noting "[g]enerally, a crime defined by statute is sufficiently charged in the words of the statute"). The two accompanying affidavits clearly describe defendant's reckless operation of his truck, including its impact with the complaining witness's home and the resulting damage, and the fact that the truck struck the complaining witness's daughter's room. That aside, defendant makes no showing that the perceived lack of clarity in the information prejudiced his defense. See *Neisner*, 2010 VT 112, ¶ 32 ("This was not a case where a defendant is surprised by an additional charge and is unprepared to present evidence in defense.") (quotation omitted). To the contrary, his attorney made clear that he understood the basis of the charge, focusing during voir dire on the fact that a young child was one of the alleged victims of defendant. Defendant's reliance on *State v. Phillips*, 142 Vt. 283, 455 A.2d 325 (1982), does not further his cause. That case involved a three-charge information that alleged three crimes based on a single statute, included no specific acts, and referenced a sixteen-month span of time when the defendant may have committed the alleged crimes. Defendant faced no such "morass" here. *Id.* at 290, 455 A.2d at 329.

¶ 41. The final claim before us returns our focus to defendant's conviction for aggravated assault, preventing a police

officer from performing a lawful duty. Defendant moved for a judgment of acquittal on both assault charges, arguing neither officer suffered bodily injury. The trial court denied the motion, and defendant appeals the denial on one of the charges. We review such a request under an exacting standard. *State v. O'Dell*, 2007 VT 34, ¶ 4, 181 Vt. 475, 924 A.2d 87 (explaining standard of review to require viewing evidence in light most favorable to the State, and determining if it is sufficient to fairly and reasonably convince jury of defendant's guilt beyond reasonable doubt). Defendant claims the State did not prove that his kick, which pushed one of the arresting officers backward, caused physical "injury" sufficient to sustain a conviction under 13 V.S.A. § 1024(a)(4) beyond a reasonable doubt.[5] "Injury," for the purposes of § 1024, means "physical pain, illness or any impairment of physical condition." 13 V.S.A. § 1021(1). When asked if he suffered any physical pain from the kick, the officer in question testified that "[t]here was some discomfort, yes." While we recognize that "discomfort" and "pain" are not strictly synonymous, the officer's testimony was sufficient to support defendant's conviction on this charge beyond a reasonable doubt.

*Affirmed.*

---

[5] 13 V.S.A. § 1024(a): "A person is guilty of aggravated assault if the person: . . . (4) with intent to prevent a law enforcement officer from performing a lawful duty, the person causes physical injury to any person . . . ."