2013 VT 9

## State of Vermont v. Mark Vuley

[70 A.3d 940]

No. 11-087

Present: **Reiber, C.J., Dooley, Skoglund, Burgess and Robinson, JJ.**

Opinion Filed February 8, 2013

Motion for Reargument Denied June 4, 2013

---

*Thomas Donovan, Jr.*, Chittenden County State's Attorney, and *Pamela Hall Johnson*, Deputy State's Attorney, Burlington, for Plaintiff-Appellee.

*Mathew F. Valerio*, Defender General, and *Marshall Pahl*, Appellate Attorney, Montpelier, for Defendant-Appellant.

¶ 1. **Dooley, J.** What are the chances? This case poses the question of when that familiar rhetorical question is also a valid legal inference. Defendant was convicted of two counts of arson after four unexplained fires occurred at his rented house within an eight-week period. The trial court itself relied upon — and instructed the jury that it might rely upon — the fact that rare events like fires do not normally happen together in order to infer that defendant willfully started the fires. Although we agree that there are potentially valid inferences to be drawn from the multiplicity of fires, we cannot approve the trial court's instruction. However, we affirm because the error does not rise to the level of plain error.

¶ 2. In late 2008 and early 2009, defendant and his family rented a single-family home with a detached two-car garage in Colchester. Between November 28, 2008, and January 18, 2009, the Malletts Bay Fire Department, as well as the Colchester Police Department, responded to four separate fires at that residence. These fires represented four of the ten fires to which

the Malletts Bay Fire Department responded in all of 2008 and 2009.

¶ 3. At around 1:00 p.m. on November 28, 2008, flames engulfed the detached garage at defendant's residence. By the time the fire department arrived, the fire had broken through the roof and was blowing out of the top of the structure. The fire destroyed the garage, but the fire department was able to contain it and keep it from spreading further. A neighbor testified that before the firefighters arrived defendant was unsuccessfully attempting to put the fire out with a small kitchen fire extinguisher. Responding officials described defendant as pacing, very upset, and near tears. He stated that he had no idea how the fire had started — one of the officials testified that he explained: "I was spending the day watching Kiss videos and getting loaded." Sure enough, firefighters made note of Kiss videos playing on the television, and a preliminary breath test of defendant revealed a blood-alcohol content (BAC) of .288. An area resident testified that, as he was watching the fire, defendant — visibly intoxicated — approached him and said, "Good fire, huh?" and "So I did a good job, then, right?" Ultimately, the cause of the fire was considered "undetermined," which was explained at trial to mean that authorities were "unable to find a definitive reason why that fire started," because of the fire's extensive destruction of any physical clues. Authorities investigated the possibility that the fire might have been caused by burning leaves in the backyard, by faulty electrical wiring in a garage light, or by an older refrigerator located in the garage, but no physical evidence was present to confirm a particular theory.

¶ 4. Approximately one month later, at roughly 6 p.m. on Christmas Day, the fire department responded to a fire in a clothes dryer in the basement of defendant's residence. The dryer was an older model and was heavily loaded at the time of the fire. Defendant's wife testified that she had started a large load of items in the dryer, including kitchen towels that defendant regularly used to clean out the deep fryer. At trial, the fire chief testified that dryers can and do catch fire, but that inspection of this dryer did not reveal any of the common malfunctions. Vegetable oils were found on some of the clothes, but no accelerants or other materials were present to suggest that the fire was deliberately set. Investigating officers said defendant told them that he was the only one home at the time, that he was doing laundry, and that he noticed smoke while he was watching

television. The fire chief noted signs of intoxication in defendant's behavior, and defendant submitted to a preliminary breath test, which produced a BAC of .210. Once again, the cause of the fire was considered undetermined.

¶ 5. A little over one week later, at approximately 4 a.m. on January 5, 2009, a neighbor reported a fire on the enclosed porch of defendant's residence. A Colchester police officer arrived at the scene before the fire department, and he was able to contain the fire with the fire extinguisher from his cruiser until the fire department arrived and fully extinguished it. The fire occurred in some odds and ends of pressure-treated lumber that were stacked on the porch, which was undergoing some renovation. At trial, the police officer testified that defendant's family members were the only people in the house when he arrived, and a firefighter circled the house and found no footprints in the snow. The responding officer testified that defendant stated that he had smoked a cigarette on the porch around midnight and had seen nothing wrong. Empties showed that defendant had consumed nine 24-ounce cans of beer that night. Because of the prior fires, the state police fire investigator was called to the scene, and he ultimately concluded that the fire was "intentionally set." This conclusion was not based on physical evidence of the cause of the fire but rather on the fact that "there were no other viable ignition sources in the area to explain how the fire started." The investigator did consider the possibility that a cigarette might have caused the fire, having found cigarette butts on the porch and knowing that defendant and his wife were smokers. In fact, defendant's wife testified that defendant smokes roughly a pack a day, that she smokes five to ten cigarettes a day, and that both of them generally used the porch as the area for smoking. Nevertheless, the investigator ruled out that cause based on defendant's strong assertion that he had not dropped a cigarette on the porch that day. At trial, a defense expert disagreed with the decision not to classify the cause of the fire as "undetermined," noting that there were easily ignitable materials and that "we have a man who drinks a lot, smokes all over the place."

¶ 6. Finally, just after midnight in the early morning of January 18, 2009, the fire department responded to another fire at defendant's residence. By the time they arrived, the firefighters found the south side of the house fully engulfed in flames. The fire department was unable to prevent the fire from completely

destroying the residence and all of its contents. Defendant, who had been home alone, had apparently been forced to break a window to escape the fire, and he had cut his hands on the glass, requiring medical attention. The only footprints found around the house were those of defendant evacuating. A police officer at the scene spoke to defendant and noticed strong signs of intoxication. Defendant told the officer that he had consumed "ten or so beers," at which point the officer took defendant into protective custody, where a preliminary breath test indicated a BAC of .155. At trial, a state police fire investigator testified that the fire started on the porch, just outside the kitchen. The investigator was able to rule out several possible causes for the fire, including electrical faults and environmental ignition, and he was able to determine that "it came down to human involvement somehow." He explained that "something had to be either placed there or started there to make this fire go," but he could not say whether it was intentional or not. Specifically, he noted that it was possible for a cigarette to have started the fire. The defense expert stated that the cause of the fire should be classified as "undetermined," largely because it was not possible to rule out careless smoking as the cause of the fire.

¶ 7. The State charged defendant with four counts of first-degree arson, alleging that he "willfully and maliciously . . . caused to be burned [a] dwelling house . . . or other outhouse that is parcel thereof . . . in violation of 13 V.S.A. § 502." Initially, the State also charged him with four counts of setting a fire to defraud an insurer in violation of 13 V.S.A. § 506. However, although the family had renters' insurance that paid out on the first and fourth fires, defendant's wife insisted that defendant was unaware of the policy because she handled matters of that nature. In response, prior to trial, the State dropped the four counts of setting a fire to defraud an insurer. Also prior to trial, the defense moved to dismiss all the charges for lack of a prima facie case, see V.R.Cr.P. 12(d), and alternatively to sever all the charges for separate trials. The court denied these motions as untimely filed.

¶ 8. At trial, the defense moved to dismiss all counts at the close of the State's case. Defense counsel argued that, with regard to each count, the State had failed to provide sufficient evidence to prove that the fire was intentionally set and that intent could not be inferred from the other fires. In response, the State argued that the frequency of the fires — four in eight weeks — showed

that the fires were not accidental. After pressing the State, to no avail, for some legal authority to support its desired inference, the judge introduced sua sponte the so-called "doctrine of chances," which the judge described as holding that "when you have an unusual number of events that don't normally occur accidentally, the jury can infer that they occurred intentionally, and that's exactly what we have here." The judge referred the attorneys to *People v. Mardlin*, 790 N.W.2d 607 (Mich. 2010), *State v. Allen*, 725 P.2d 331 (Or. 1986), and *State v. Lizotte*, 109 Vt. 378, 197 A. 396 (1938). On the basis of the doctrine of chances, the trial court denied the motion to dismiss.

¶ 9. The trial court also drafted a jury instruction based on the doctrine of chances. In full, the instruction read:

In this case, there is evidence of four different fires at Mr. Vuley's home. The defense claims that each of these fires was undetermined.[1] It is your job to examine each incident separately to determine whether the State has proved beyond a reasonable doubt each of the elements of arson or attempted arson for each of the fires.

You may consider the meaning of the evidence that four different fires occurred at Mr. Vuley's house. The weight to be given to evidence that four fires occurred is left to your common sense and judgment. You may, but are not required to, apply the doctrine of chances, as follows. Based on ordinary common sense and human experience you may conclude that it is unlikely that this number of similar accidents would occur on the same property in a short period of time. Considered in isolation, one fire may be easily explained as an accident. However, when all similar incidents are considered collectively or in the aggregate, the doctrine of chances may create an inference of human design. You may conclude that the recurrence of similar incidents incrementally reduces the possibility of accident. The improbability of a

---

[1] The original instruction given to the jury instead contained the sentence, "Mr. Vuley claims that each of the fires was accidental." After the instructions were given, defense counsel noted that this implied that defendant had offered a particular account, and the judge agreed to give the jury a revised instruction with the above-quoted replacement sentence.

coincidence may cause you to conclude that the fires were intentionally set.

From the evidence of four separate fires, you may (but are not required to) infer that the four fires were not the result of accidental or natural causes, but were the willful act of some person.

At the charge conference, defense counsel objected to this proposed instruction. Defense counsel began by pointing out that, in the three cases cited by the court the day before, the other incidents were not the subject of simultaneously pending charges. When asked why this should make a difference, defense counsel argued that the instruction "relieves the State of its burden . . . to prove each and every element of each and every crime." Ultimately, the court cut defense counsel off, stating "Well, we agree to disagree and I'm going to include it." The defense renewed the objection following the jury charge but did not elaborate.

¶ 10. After deliberation, the jury acquitted defendant on the first two counts, which related to the earlier incidents, but convicted on counts three and four, which related to the later incidents. Defendant appeals, arguing that the trial court erred by (1) not granting the motion to dismiss, (2) giving the jury instruction on the doctrine of chances, and (3) refusing to grant the motions to sever and dismiss for lack of a prima facie case. We first consider the denial of the motions and then proceed to the issues involving the doctrine of chances.

I.

¶ 11. The circumstances surrounding the motions to dismiss and to sever are as follows. The information to commence this case was filed on September 30, 2009. Status conferences were held in October and November of that year, and then on January 26, 2010. At the January conference, the parties filed a stipulated schedule, with depositions to be conducted by May 1 and motions to be filed by May 15. The schedule could not be met, and at a May 11 status conference, the court extended the deadlines, setting the motion deadline at August 13 and ordering that the trial commence in September, with no further continuances. At a July 20 status conference, the parties reported that depositions had not been completed and they would not be ready for trial in

September. The court continued the trial date to November without resetting any other deadlines. At a status conference in October, the court set a new trial date of December 6. Thereafter, on November 17, defendant filed a motion to dismiss for lack of a prima facie case or, if the prosecution was to proceed, to sever all counts. The court denied the motion as beyond the deadline for motions — August 13 — set at the May status conference and never modified. Thereafter, the court denied a motion for reconsideration.

■ ¶ 12. Defendant argues on appeal that the motion deadline had been impliedly extended, and it was an abuse of discretion to deny the motion for reconsideration. The two motions defendant filed in November were pretrial motions. See V.R.Cr.P. 12(b)(5), (d); Reporter's Notes, 1984 Amendment, V.R.Cr.P. 12(d); V.R.Cr.P. 14(b)(4). Thus they were subject to the filing deadline of Vermont Rule of Criminal Procedure 12(c), which is the date of the status conference following arraignment, or twenty-eight days after arraignment if there is no status conference, "unless extended by the court." V.R.Cr.P. 12(c). Failure to file motions by the applicable deadline in Rule 12(c) is a waiver of the right to file the motion unless the court grants relief from the waiver "for cause shown." V.R.Cr.P. 12(f); see *State v. Dann*, 167 Vt. 119, 136, 702 A.2d 105, 116 (1997).

■ ¶ 13. Defendant argues that there was no waiver here because the trial judge who conducted the July status conference, a different judge from the one who imposed the time deadlines, impliedly removed the deadline for filing motions. Defendant relies upon an interchange in the status conference in which defense counsel stated that all depositions could not be done by July 31, and the judge responded that she did not care when the depositions were done. Defense counsel then responded, "[I]t drives everything out. It drives the motion — and everything." The exchange is vague, and defense counsel does not explicitly state that the motion deadline cannot be met. The court did not extend the motion deadline, either orally or in writing. In fact, the court continued the trial date, but did not address the motion deadline. We conclude that the lawyers who were subject to a written court-imposed deadline bore the burden of having it explicitly continued or removed. The failure to do so here meant that pretrial motions could not be filed after the deadline.

¶ 14. Defendant urges us to reach the same result by holding that the court should have granted the motion for reconsideration. The motion for reconsideration was premised on the representation that the parties "asked the court for additional time . . . to file motions" and the status conference judge "granted the joint request." The court denied the motion for reconsideration indicating that there was no entry that the status conference judge had granted such a request and the motions were not timely filed. We note that there is no support in the record for the representation that the parties requested that the motion deadline be extended and none for the further representation that the court granted the request.

¶ 15. As defendant acknowledges, the trial judge's ruling was discretionary, and we will overturn it only on a finding of abuse of that discretion. *Dann*, 167 Vt. at 137, 702 A.2d at 116. As we noted in *Dann*, the point of pretrial motions is that the court should confront them before the court addresses the merits of the case and the parties have commenced preparing for trial. *Id.* at 136, 702 A.2d at 116. We also found important in *Dann* that the only reason given for why the motion could not have been filed earlier was weak. *Id.* at 137, 702 A.2d at 116. Here, defendant gave no reason for why the motions could not have been filed earlier, and we can see no reason in the record. Defendant did not appeal to the discretion of the trial judge, but argued the point that there had been no waiver, the argument we rejected above. We find no abuse of discretion.

¶ 16. The remaining two claims on appeal directly involve the doctrine of chances. Before reviewing them, we first address the doctrine of chances. The doctrine of chances has evolved as a theory about the grounds for the admission of evidence. Evidence of other crimes or acts is not admissible to demonstrate a person's character for the purposes of showing that a person acted in conformity therewith. V.R.E. 404(b). Against the backdrop of this prohibition, the doctrine of chances purports to offer an explanation of the logical relevance of other incidents that does not rely upon character-based reasoning. The classic articulation of the doctrine comes from Wigmore:

> To prove Intent, as a generic notion of criminal volition or willfulness, including the various non-innocent mental states accompanying different criminal acts, there is

employed an entirely different process of thought. The argument here is purely from the point of view of the doctrine of chances, — the instinctive recognition of that logical process which eliminates the element of innocent intent by multiplying instances of the same result until it is perceived that this element cannot explain them all. . . . [T]he mind applies this rough and instinctive process of reasoning, namely, that an unusual and abnormal element might perhaps be present in one instance, but the oftener similar instances occur with similar results, the less likely is the abnormal element likely to be the true explanation of them. . . . In short, similar results do not usually occur through abnormal causes; and the recurrence of a similar result (here in the shape of an unlawful act) tends (increasingly with each instance) to negative accident or inadvertence or self-defence or good faith or other innocent mental state, and tends to establish (provisionally, at least, though not certainly) the presence of the normal, *i.e.* criminal, intent accompanying such an act . . . .

1 J. Wigmore, Evidence § 302, at 611-12 (2d ed. 1923). The logic resonates with common sense. As one court succinctly explained, "The man who wins the lottery once is envied; the one who wins it twice is investigated." *United States v. York*, 933 F.2d 1343, 1350 (7th Cir. 1991), *overruled on other grounds by Wilson v. Williams*, 182 F.3d 562 (7th Cir. 1999). An archetypal example of the doctrine is the English case of *Rex v. Smith*, 11 Cr. App. R. 229, 84 L.J.K.B. 2153 (1915), in which the defendant had three wives who all suspiciously drowned while taking a bath. The court held that the other two deaths were probative with regard to whether the charged death was an accident.

¶ 17. The doctrine of chances is regularly invoked in arson cases. In fact, Professor Imwinkelried illustrates the doctrine with a discussion of arson:

Suppose that the defendant is charged with arson. The defendant claims that the fire was accidental. The cases routinely permit the prosecutor to show other acts of arson by the defendant and even nonarson fires at premises owned by the defendant. In these cases, the courts invoke the doctrine of objective chances. The

courts reason that as the number of incidents increases, the objective probability of accident decreases. Simply stated, it is highly unlikely that a single person would be victimized by so many similar accidental fires in a short period of time. The coincidence defies common sense and is too peculiar.

1 E. Imwinkelried, Uncharged Misconduct Evidence § 4:1, at 4-6 to -9 (rev. ed. 2008). The cases upon which the trial court relied are examples of this reasoning. In *Mardlin*, for example, the Michigan Supreme Court held admissible in an arson case evidence of four previous home and vehicle fires — all of which involved insurance claims — associated with the defendant. 790 N.W.2d at 610-11. The present case poses the open question of whether Vermont law similarly approves the inference described by the doctrine of chances.[2]

■ ¶ 18. Despite an illusory simplicity, the doctrine of chances faces a high hurdle: the need to demonstrate specific, criminal intent. Further, it must do so without engaging in propensity reasoning, which is the claim that because a person once engaged in certain criminal conduct, the person is more likely to do it again. A careful look at the doctrine of chances shows that it actually describes a number of different inferences, some of which

---

[2] This Court has adopted superficially similar reasoning in *State v. Lizotte*, where we wrote:

> The mere fact of the burning of a building is not sufficient to establish the *corpus delicti*, for if nothing more appears it will be presumed that the fire was the result of accident or some providential cause, rather than the result of a criminal design. But the incendiarism may be proved by circumstantial evidence.
>
> Here we have the evidence that there were three simultaneous fires. . . . [The two fires in the house could not have been caused by a stove or by the barn fire.] These facts were amply sufficient to permit the jury to find that the three fires were not the result of accidental or natural causes, but were the willful act of some person.

109 Vt. at 385-86, 197 A. at 399 (citations omitted). As defense counsel correctly distinguished, however, that case did not involve multiple incidents, but rather one charged incident and an inference as to the cause of that single incident. The multiplicity of starting locations was used to infer that a fire was intentionally caused, the same way that the presence of accelerants might be. The question in this case is different: may a jury infer from the presence of other separate fires before or afterwards that a particular charged fire constituted arson?

meet the challenge and avoid propensity reasoning and some of which do not. The conflation of these various modes of reasoning under the same name is the source of a great deal of confusion in the case law and the commentaries.

■ ¶ 19. The first inference that is described as the doctrine of chances might be explained as follows: where independently improbable events occur together, it is likely that some common cause exists that explains them all. This is actually a two-step inference. First, one infers from the unlikelihood of multiple improbabilities coinciding that something abnormal must be present. Second, one derives from the posited abnormality an explanation of each individual incident. That is, one first infers that not all instances could be a matter of chance, and then infers that, if not all were a matter of chance, then each one is more likely to have been not a matter of chance. For example, if ten children in a home die from an unusual respiratory illness, one might infer that there is something in the house causing the illness. And this makes it more likely that any particular case of respiratory failure in the house is caused by this underlying source, as opposed to random misfortune. We might call this the probabilistic doctrine of chances.[3] Lightning doesn't strike twice — unless there's a reason.

¶ 20. Defendant argues that the latter inference is not logically supported and based his motion to dismiss on this argument. He asserts that, even if the objective probability of all the incidents occurring together is very low, the probability of each individual incident is unaffected. Flipping heads ten times in a row is very

---

[3] As examples make clear, this use of the doctrine of chances arises where the inference is used to shed doubt on the likelihood of some natural accident. See *State Farm Fire & Cas. Co. v. Allied & Assocs.*, 860 F. Supp. 2d 432, 442 (E.D. Mich. 2012) ("Properly applied, the 'doctrine' dispels the idea that serial unusual events can be dismissed as coincidence, and raises suspicion calling for further investigation. But to support the inference of concert of action or conspiracy, more is required."); *United States v. Graham*, 50 M.J. 56, 62 (C.A.A.F. 1999) (Sullivan, J., dissenting) ("The fact of a prior positive-drug test provided a more complete picture of appellant's drug history and undermined his credibility with respect to his denial of the current charges. After all, the jury was entitled to know that appellant was in reality asserting that he was struck by lightning twice."); *Robbins v. State*, 88 S.W.3d 256, 268 (Tex. Crim. App. 2002) ("[E]vidence that Tristen repeatedly suffered physical injuries while she was in appellant's care increases the probability that Tristen's injury on the day of her death was the result of some act, careless or otherwise, committed by appellant.").

unlikely — less than one in a thousand — such that one might infer that there is something unfair about the coin or the coin flipper. But, as defendant correctly points out, this improbability does not establish the same certainty that any particular flip, say the second one, was unfair. Our certainty that the collection of events was not random will always be greater than our certainty that any individual event was not random. So far, we agree. It does not follow, however, that no evidentiary inference is possible as to individual flips. Although we cannot say that there was only a one-in-a-thousand chance that the second flip was fair, we can say that there is *some* evidence that it was not fair. Given that it is highly unlikely that all the flips were random, this makes it more unlikely that the second flip was random — not as highly unlikely, but more unlikely. This is because, insofar as we can infer the presence of some sort of irregularity, it makes it more likely that such an irregularity affected each individual instance. This is the second stage of the overall inference described above, and there is nothing improper about this reasoning. It does not relieve the State of its burden — it simply acknowledges that the presence of other associated events may suggest a defeasible hypothesis for explaining a particular, otherwise improbable event. After all, what are the chances?

¶ 21. Matters are somewhat more complicated, however, when this reasoning is applied more specifically to multiple human actions over time. Here, we reach the hurdle of determining intent. Explaining human action is what is involved in the second form of inference described as the doctrine of chances: where actions that might independently have been accidental occur together, that makes it more likely that the acts were not accidental.[4] This reasoning is simply an application of the above-referenced probabilistic reasoning applied to human action, and it

---

[4] Although courts do not always distinguish the inference being made, some applications of the doctrine clearly have this second form. See, e.g., *State v Monroe*, 364 So. 2d 570, 573 (La. 1978) (allowing evidence of subsequent similar killing the following night where defendant claimed that both killings were self-defense); *Brown v State*, 96 S.W.3d 508, 512 (Tex. Ct. App. 2002) ("When the defendant's intent to commit the offense charged is at issue, the relevance of an extraneous offense derives from the doctrine of chances — the instinctive recognition of that logical process which eliminates the element of innocent intent by multiplying instances of the same result until it is perceived that this element cannot explain them all. An unusual or abnormal element might be present in one

has the same two-step form. First, one infers that all of the acts could not have been accidental — there must be something intentional about some of this person's conduct — and then one infers that this intentionality likely explains each particular incident. For example, if a man shoots three different wives and asserts that each shooting was accidental, one might infer that not all of them could have been accidents and that, more likely, the man has intentionally killed all of them. As we already said, drawing this inference is logically supported. This is simply the probabilistic doctrine of chances applied to human behavior.

¶ 22. Nevertheless, we conclude that this second form of inference is generally impermissible. The barrier is that, although logically relevant, probabilistic reasoning about human behavior of the form necessary to the second step runs afoul of the prohibition against using propensity-based reasoning. Inferring from the implausibility of all occurrences being accidents that any particular occurrence was not an accident necessarily involves reasoning based on propensity.[5] Consider the above example. From the series of shootings, one can infer that it is unlikely that the killings were all accidents. This is logically equivalent to the

---

instance, but the more often it occurs the less likely it is to be the true explanation." (citations omitted)).

[5] Some commentators have recognized this point. See A. Morris, *Federal Rule of Evidence 404(b): The Fictitious Ban on Character Reasoning from Other Crime Evidence*, 17 Rev. Litig. 181, 201-03 (1998) ("The very process of eliminating (or reducing to a negligible level) the odds that the charged act was accidental necessarily involves the assumption that the defendant's character is constant. This is so because the bad act evidence supports the finding of intent only if one assumes that the character traits that can be inferred from the uncharged misconduct evidence are continuing. We cannot eliminate that assumption and still treat the accumulation of evidence of repeated incidents of misconduct as probative. . . . [W]e assume that all of the outcomes are alike. This requires the assumption of continuity of character, or classic propensity reasoning."); P. Rothstein, *Intellectual Coherence in an Evidence Code*, 28 Loy. L.A. L. Rev. 1259, 1262-63 (1995) ("The essence of this probable guilt argument is that there is a disparity between the chances, or probability, that an innocent person would be charged so many times and the chances, or probability, that a guilty person would be charged so many times. If there is such a disparity, however, it is only because a guilty person would have the propensity to repeat the crime. If it were not for the propensity to repeat, the chances, or the probability, that an innocent person and a guilty person would be charged repeatedly would be identical. Hence, the argument hinges on propensity and runs afoul of the first sentence of Rule 404(b)."); see also *State v. McManus*, 594 N.W.2d 623, 631 (Neb. 1999) (noting "the apparently flawed reasoning underlying the doctrine of chances").

conclusion that at least one of the killings was not an accident. But it would be an inference based on propensity to say that, because a man has intentionally killed *a* wife, he is therefore more likely to have intentionally killed *this* wife.[6] For this reason, in *In re S.G.*, we rejected an attempt — based on the same section in Wigmore — to introduce evidence of abuse of one child to show that an unexplained broken bone in another child was less likely to be an accident. 153 Vt. 466, 471, 571 A.2d 677, 680 (1990); see also *State v. Lipka*, 174 Vt. 377, 396 n.11, 817 A.2d 27, 43 n.11 (2002) (reiterating reluctance to adopt Wigmore rationale). This is not, of course, to deny that there is a logical chain of inference in such cases. The whole point of the propensity-based prohibition in Vermont Rule of Evidence 404[7] is that it excludes evidence that is logically relevant. When one applies the probabilistic doctrine of chances to human behavior, one gets a logically valid inference, but one that is based on human propensity to act in conformity with other bad acts — precisely what the rule of evidence does not allow.[8]

---

[6] There is a difference from the prototypical propensity reasoning. In the prototypical case, one reasons from the fact that a man murdered *that* wife to the fact that he murdered this wife. In this case, one reasons from the fact that a man murdered *a* wife (possibly that one, possibly this one) to the fact that he murdered this wife. But this difference is not significant. The purpose of the prohibition on propensity reasoning is to ensure that a defendant is not convicted on the basis of conduct other than that charged. For essentially the same reason, we do not allow a conviction to be based on general evidence of wrongdoing, but rather require proof of wrongdoing on a particular occasion. See, e.g., *State v. Bonilla*, 144 Vt. 411, 413, 477 A.2d 983, 985 (1984) ("[W]here there is evidence of many acts, any one of which would constitute the offense charged, an election must be made."). Defendant's conviction on each count of arson cannot be based on evidence that he intentionally caused *a* fire, but requires proof that he intentionally caused *the* particular fire in that count.

[7] We are not here attempting to explain the purpose and scope of Evidence Rule 404(b). We are merely explaining how the two-step reasoning in the doctrine of chances employs propensity reasoning.

[8] Despite this inference from guilt in general to guilt in a particular case, a number of courts and commentators assert that the doctrine of chances does not involve impermissible propensity inferences. See, e.g., E. Imwinkelried, *An Evidentiary Paradox: Defending the Character Evidence Prohibition by Upholding a Non-Character Theory of Logical Relevance, the Doctrine of Chances*, 40 U. Rich. L. Rev. 419, 437 (2006) (arguing that doctrine of chances does not involve judgment of "the defendant's personal, subjective bad character"). This insistence is normally based on the idea that the doctrine of chances concerns only "objective probability" and not any character assessment. See, e.g., *York*, 933 F.2d at 1350

 ¶ 23. While the general prohibition against propensity-based evidence might, at first blush, suggest that the doctrine of chances cannot be used, there is a valid third and altogether different inference that goes under the header of the doctrine of chances: where someone has *already* committed an unusual act with bad consequences, it is more likely that *subsequent* acts of that type were not accidental.[9] This inference is based on the understanding

---

("This inference is purely objective, and has nothing to do with a subjective assessment of [the defendant's] character."); *Green v. State*, 89 So. 3d 543, 557 (Miss. 2012) (Dickinson, J., concurring) (stating that use of evidence under doctrine of chances "is based on probability, not propensity"); *People v. Breidenbach*, 798 N.W.2d 738, 745 n.23 (Mich. 2011) ("The doctrine of chances creates a non-character basis for the admission of evidence of other acts when the other acts are related to the offense charged in such a way as to make it objectively improbable that all the acts were accidental and probable that at least one of them was the result of an *actus reus*."). This explanation fails to distinguish the two stages of the inference. The first stage states that it is objectively improbable that all the events were accidental. But the second stage involves inferring that the same thing, namely criminal intent, explains an individual event. Without this second stage, the doctrine would shed no light on any particular charged crime. But see Imwinkelried, *An Evidentiary Paradox, supra*, at 456-57 ("It is significant that the only conclusion flowing directly from doctrine of chances reasoning is that one or some of the incidents were not accidents."). This second stage only makes sense if one assumes that someone who has committed a crime once is more likely than an average person to have committed that same crime in another circumstance. Even if — as a matter of statistical probabilities — this is correct, it is a prohibited basis for inferring guilt. See C. Goodman, *The Color of Our Character: Confronting the Racial Character of Rule 404(b) Evidence*, 25 Law & Ineq. 1, 10 (2007) ("While probability statistics are useful to predict and to explain human behavior, the reliance upon generalizations and characterizations leads to impermissible propensity inferences when dealing with other crimes evidence in the category of intent, absence of mistake, or accident."). Propensity reasoning does not become permissible by virtue of being backed by objective probabilities. The objective/subjective distinction is a red herring here.

[9] Although courts are not generally careful in distinguishing this third form of reasoning from the second, this thought appears to be the driving influence in many applications of the doctrine of chances. See, e.g., *People v. Robbins*, 755 P.2d 355, 362 (Cal. 1988) ("The inference to be drawn is not that the actor is *disposed* to commit such acts; instead, the inference to be drawn is that, in light of the first event, the actor, at the time of the second event, must have had the intent attributed to him by the prosecution."), *superseded by statute on other grounds*; *State v. Craig*, 361 N.W.2d 206, 213 (Neb. 1985) (holding that evidence of fifteen previous incidents in which defendant had disrobed adopted daughter made implausible his claim that disrobing and inappropriate touching was accidental in course of playfulness); *State v. Stager*, 406 S.E.2d 876, 891-93 (N.C. 1991) (explaining that doctrine of chances could be applied to shed doubt on wife's claim

that people learn from their mistakes. If someone has accidentally done something with terrible consequences, then that person becomes less likely to do that same thing accidentally a second time. The person is likely to have a heightened awareness of the consequences and therefore is less likely to be careless. For example, a man who accidentally shot his first wife will be less likely than an average person to accidentally shoot his second wife. As a result, one can infer that a subsequent shooting — especially one under distinctly similar circumstances — is less likely to be inadvertent and therefore more likely to be intentional. We might call this the psychological doctrine of chances. To see the difference, note that the probabilistic doctrine of chances would find it more likely that each improbable incident was not an accident, whereas the psychological doctrine of chances would apply to primarily explain subsequent incidents.[10] Note that the psychological doctrine of chances provides no inference that the first incident was not an accident.

_____

that she accidentally shot her husband with .25-caliber semi-automatic pistol where her first husband died in same way); *Scott v. State*, 720 S.W.2d 264, 267 (Tex. Ct. App. 1986) ("The plausibility of appellant's defensive theory [that he accidentally exposed himself to twelve-year-old girl] is greatly reduced, however, when it is learned that seventeen days before his 'accidental' encounter with [the girl], he had 'accidentally' been seen by the female attendant of a convenience store while using the store's restroom."). Some commentators' descriptions of the doctrine also seem to have an element of this thought. See, e.g., Imwinkelried, Uncharged Misconduct Evidence, *supra*, at 5-16 ("The doctrine teaches us that the more often the defendant performs the actus reus, the smaller is the likelihood that the defendant acted with an innocent state of mind. The recurrence or repetition of the act increases the likelihood of a mens rea or mind at fault."); 22A C. Wright & K. Graham, Federal Practice and Procedure § 5247, at 344 (2d ed. 2012) ("Often the absence of mistake or accident is proved on a notion of probability; i. e., how likely is it that the defendant would have made the same mistake or have been involved in the same fortuitous act on more than one occasion. The relevance of other crimes for this purpose depends very much on the nature of the act involved; one might inadvertently pass more than one counterfeit bill but two accidental shootings of the same victim seem quite unlikely.").

[10] This is not to say that it leaves no logical inference about the first incident because we might infer that the person did not learn from the first incident because it was not accidental. This third version of the doctrine of chances might explain the actions of the jury which convicted on counts 3 and 4 but acquitted on counts 1 and 2. An alternative explanation, however, is that the later two fires were the ones for which the State's experts definitively ruled out nonhuman ignition sources.

¶ 24. There is nothing impermissible about the inference involved in the psychological doctrine of chances. Essentially, this reasoning treats the past incidents not as bad acts attributable to the defendants, but as events that would affect defendant's knowledge and mental state. When introduced for this purpose, the previous fires serve essentially the same purpose as when prior bad acts are used to show intent or knowledge. See V.R.E. 404(b); *In re S.G.*, 153 Vt. at 471, 571 A.2d at 680 (noting that, although impermissible to infer abuse, "the earlier incident would raise skepticism that the mother was unaware that S.G.'s symptoms were caused by a broken leg"). In this form, the doctrine of chances is less about cosmic happenstance and more about the relevance of individual history to a person's mental state. We have no difficulty concluding that the latter is an appropriate sort of evidence for a jury to consider.

## II.

¶ 25. Against this backdrop, we consider the application of the doctrine of chances to this case. Courts are often confused by the difference between these three types of inference. This confusion is compounded where, as here, the factual situation introduces the possibility of all three forms of inference and there is no obvious motive for the alleged crimes. First, it is highly implausible that the four fires were simply unrelated freak accidents: an electrical problem, a dryer malfunction, combustion in some spare lumber, and so on. Something unusual was going on in defendant's house. To the extent that defendant maintained that his household was just extremely unlucky, the doctrine of chances is a basis for rejecting this explanation. The doctrine provides a reason why the other fires are probative to the individual counts. This much, however, is compatible with the thought that the fires were nonetheless accidental — it does not get the State specific criminal intent.

¶ 26. One might use the doctrine of chances in the second way in order to suggest that even accidental ignition is implausible as an explanation for all of these fires. Defendant is surely not the only heavy-drinking smoker in Colchester, but his residence accounted in two months for forty percent of the structural fires over a two-year span. From this perspective, it is unlikely that they were all simply accidents — and therefore it is likely that some or all of them were not accidents. Although logically

relevant, this proposition cannot be used to infer that defendant is guilty of causing a specific individual fire. Such an inference would involve propensity reasoning: because defendant likely started some fire intentionally, he is an arsonist that started all fires intentionally. If the multiple fires were viewed as probative solely based on this reasoning, we must consider the result erroneous.

¶ 27. On the other hand, the psychological version of the doctrine might be used to shed doubt on any theory that the third or fourth fire was caused accidentally. Someone who has had two or three fires at his home in the span of a month should be much less likely to toss around cigarettes cavalierly. While the chance of starting a house fire may generally be so remote that someone might fail to pay it adequate attention, it is hard to imagine that defendant, after experiencing multiple recent fires, could have been similarly unaware. In this way, the previous fires make it less plausible that this was mere carelessness. Thus, the earlier fires are probative of lack of accident. Of course, their probative value would have to be weighed by the jury against countervailing evidence. In particular, heavy drinking makes carelessness more likely. But this does not mean that the previous fires are not relevant to whether the ignition was intentional, only that their relevance must be weighed alongside other facts by the jury. In short, the other fires do provide some evidence regarding defendant's mental state.

¶ 28. The jury heard the details of all four fires. The potential relevance of the multiple fires was brought out at various points. Over the objection of defense counsel, the State opened an entire line of questioning on redirect of the fire chief discussing the improbability of so many fires at one location, in which the fire chief explained, "One fire, completely believable. Two fires, wicked bad luck. Three fires, no way. . . . [M]ost homes don't burn once, let alone three times." Another firefighter spoke about the peculiarity of three fires at one location, stating that "it was extremely unusual for there to be three fires at the same address." Under the doctrine of chances, the jury did not have to be shielded from evidence of the multiple fires, and, in this case, the jury was not shielded.

## III.

¶ 29. We turn now to the issues on appeal, which implicate the doctrine of chances.

## A.

¶ 30. The first issue is whether the trial court erred in denying defendant's motion for a judgment of acquittal, relying upon the doctrine of chances. We conclude that the trial court did not err in denying the motion for a judgment of acquittal. We review de novo a motion for a judgment of acquittal. *State v. Ellis*, 2009 VT 74, ¶ 21, 186 Vt. 232, 979 A.2d 1023. The question is whether the State has produced evidence that could reasonably support a guilty verdict. See *State v. McBurney*, 145 Vt. 201, 204, 484 A.2d 926, 928 (1984) ("[T]he sole issue raised by a motion for judgment of acquittal is whether the State's evidence fairly and reasonably tends to show the defendants' guilt, so that a jury would be justified in finding guilt beyond a reasonable doubt.").

¶ 31. Reviewing the evidence in a light favorable to the State, we conclude that a jury could have concluded that defendant intentionally set the third and fourth fires.[11] With regard to both fires, the state investigators essentially testified that they could rule out causes not involving human action, but that they could not completely rule out accidental causation. The inability to rule out accidental causation was the basis for the defense's motion for acquittal.

¶ 32. We conclude that the State presented sufficient evidence to survive a motion for judgment of acquittal with respect to counts 3 and 4. There was evidence that the third and fourth fires were intentional — namely, the improbability of accident in light of the other fires. This inference, which could support a guilty verdict on these counts, is based on the psychological doctrine of chances, applicable given that defendant had experienced two recent fires at his house. One could reasonably expect him to be particularly vigilant against creating another fire. "A judgment of acquittal is proper only if the State has failed to put forth any evidence to substantiate a jury verdict." *State v. Turner*, 2003 VT 73, ¶ 7, 175 Vt. 595, 830 A.2d 122 (mem.). We conclude that such was not the case here. The evidence of the other two fires may have been only circumstantial proof of intent and it may have been counterbalanced by the evidence of defendant's drinking habits, but these are matters of weighing the

---

[11] The jury acquitted defendant of the arson charges with respect to the first and second fires. We need not, and do not, decide whether the evidence was sufficient to avoid the motion to dismiss on the first two counts.

evidence appropriate for the jury. There was no error in permitting the jury to engage in this enterprise.

¶ 33. Defendant also contests the element of identity with respect to the third fire, arguing that the evidence was insufficient to prove that he was in fact the person who set this fire. In support of this assertion, defendant argued very cursorily in his motion for a judgment of acquittal that he was not home alone during the third fire as he was during the remaining fires.

¶ 34. We conclude that the State did not need to rely on the doctrine of chances or on an impermissible inference about defendant's character to establish identity. There was sufficient evidence presented at trial from which the jury could permissibly infer that defendant was the person who started this fire. See *State v. Kerr*, 143 Vt. 597, 603, 470 A.2d 670, 673 (1983) ("[P]roof of facts includes reasonable inferences properly drawn therefrom."). As stated above, defendant was physically present when all of the fires started, and he was home alone for three of the four fires. He made statements to a neighbor after the first fire, including "Good fire, huh?," and "So I did a good job, then, right?" Defendant was unemployed and depressed. He was intoxicated when officials responded to each fire. During the third fire, there was evidence that defendant had consumed nine 24-ounce cans of beer. There was expert testimony that the third fire was intentionally set. There were no footprints in the snow around the house to support the notion that an outsider had set the fire. Defendant's wife testified that she had had not been smoking in the area where the fire started. From this circumstantial evidence, the jury could reasonably infer that defendant set the fire in question.

¶ 35. While it is true that there were other family members at home during the third fire, "the State is not required to exclude every reasonable hypothesis of innocence in proving a case with circumstantial evidence." *State v. Warner*, 151 Vt. 469, 472, 560 A.2d 385, 387 (1989). "So long as the jury by way of a process of rational inference could conclude beyond a reasonable doubt that defendant committed the acts for which he was charged, we will not disturb the jury's verdict." *State v. Godfrey*, 2010 VT 29, ¶ 18, 187 Vt. 495, 996 A.2d 237 (quotation omitted). We conclude that the State's evidence met this standard here.

B.

¶ 36. The propriety of the jury instruction presents a more difficult question. As an initial matter, the State points out that, although defense counsel objected to the jury instruction during the charge conference, defense counsel did not reassert the nature of the objection after the instructions had been read. "No party may assign as error any portion of the jury charge or omission therefrom unless he objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which he objects and the grounds of his objection." V.R.Cr.P. 30. Accordingly, the State contends that the objection to the jury instruction has not been preserved. Defendant replies that defense counsel's statement, "I would like to renew my objection to the doctrine of chances," was sufficient to satisfy the preservation requirements, particularly in light of the discussion at the charge conference.

¶ 37. We cannot agree. Our cases make clear the requirement of making an objection to jury instructions *after* the jury is charged. *State v. Wheelock*, 158 Vt. 302, 306, 609 A.2d 972, 975 (1992) ("[F]ailure to object to an instruction after it is given to the jury is considered a waiver of any error *even if the substance of the objection is made known before the jury charge.*" (emphasis added)); see also *State v. Bacon*, 163 Vt. 279, 284, 658 A.2d 54, 59 (1995) (instruction error not preserved because "it was not specifically renewed after the charge."); *State v. Pelican*, 160 Vt. 536, 538, 632 A.2d 24, 25-26 (1993). As we have explained, "The primary reason for the rule is to give the trial court one last opportunity to avoid an error." *Wheelock*, 158 Vt. at 306, 609 A.2d at 975; see also *Jones v. United States*, 527 U.S. 373, 387-88 (1999) (applying identical Federal Rule of Criminal Procedure 30). While an objection at a charge conference may help explain a complying objection made after the charge is delivered to the jury, it is not a substitute for the complying objection.

¶ 38. As for defense counsel's renewal of the objection with no explanation of the grounds after the jury was charged, it was insufficient. Rule 30 plainly demands that, before the jury retires, a party must "stat[e] distinctly . . . the grounds of his objection," not merely the objection itself. Here, defense counsel's cursory renewal, without any statement of grounds, did not comply with Rule 30. Although counsel may have believed that the content of the objection was already well rehearsed, Rule 30 requires at

least a brief restatement. See *State v. Martin*, 2007 VT 96, ¶ 42, 182 Vt. 377, 944 A.2d 867 (rejecting defendant's argument that "a general objection to the court's instruction sufficiently preserved the issue for appeal"); *Winey v. William E. Dailey, Inc.*, 161 Vt. 129, 138, 636 A.2d 744, 750 (1993) (decided under substantially identical civil rule and holding that "a blanket reference made after the charge to arguments made before the charge, even if allowed by the trial court," is not sufficient for preservation).[12] The deficiency in the language of the objection here is clearly shown by contrasting it with the language of the objection to the jury instructions in the recent case of *State v. Kolibas*, 2012 VT 37, 191 Vt. 474, 48 A.3d 610. In that case, the defendant attacked a criminal-intent instruction because it allowed a finding of intent if defendant intended to harm someone other than the actual victim. Defense counsel said after the instruction was delivered: "We object to the instruction of intent regarding the aggravated assault charges, that the State does not have to prove there was an intent to harm a specific individual." *Id.* ¶ 12. We held that "[d]efendant made a detailed objection to the court's instructions on transferred intent, and this issue is clearly preserved for review" because defense counsel stated a ground for the objection — that the instruction provided that the State did not have to prove there was an intent to harm a specific individual. *Id.* The objection in *Kolibas* would have been equivalent to the objection in this case if it had omitted the last phrase and said only that defendant objected to the intent instruction regarding aggravated assault.

 ¶ 39. Here, the deficiency in defense counsel's objection is particularly significant because of what occurred at the charge conference. Defense counsel was clear at the charge conference that she opposed the giving of the doctrine of chances instruction but less clear on the grounds.[13] She argued that it was inappro-

---

[12] Vermont Rule of Criminal Procedure 30 is identical to Federal Rule of Criminal Procedure 30 as originally adopted. See Reporter's Notes, V.R.Cr.P. 30. The United States Supreme Court intentionally made the criminal rule on jury trial instruction objections the same as the civil rule. See Advisory Committee Notes, F.R.Cr.P. 30 ("on a point such as instructions to juries there should be no difference in procedure between civil and criminal cases"). We did the same. Thus, a civil case on point is applicable to our application of Rule 30.

[13] The State argues that none of the grounds stated at the charge conference are the same as the grounds asserted on appeal. Because we find there was no

priate to use the doctrine as a jury charge, rather than as a rule of evidence. She claimed the doctrine would allow the jury to find intent for each fire solely because there were four fires. She generally claimed that the instruction would relieve the State of its burden of proof and deny her client due process of law. She argued that the doctrine could rest on uncharged misconduct evidence but not on charged conduct because the latter had to be proven beyond a reasonable doubt. As she developed her objection, the trial judge interrupted and said that they — the judge and the defense attorney — would have to agree to disagree, ending the discussion. We concur with defendant that an argument truncated by the trial court is normally sufficient to preserve unstated grounds for objection. See *People v. Boyette*, 58 P.3d 391, 412 (Cal. 2002) (holding there was preservation where "[d]efense counsel made several objections that were cut off by the trial court before counsel could articulate fully the grounds of his objection"). However, the issue here is not whether defense counsel preserved the ground for her objection at the charge conference, but instead whether she preserved the grounds after the instruction was read to the jury. Not having been able to fully state the grounds at the charge conference reinforced the need to state them fully after the charge was given. Instead, defense counsel stated no grounds.

■ ¶ 40. Because defendant failed to comply with Rule 30, we review only for plain error.[14] See *State v. Doleszny*, 2004 VT 9,

---

preservation under Rule 30, we do not reach this argument. We do note, however, that defense counsel did not argue at the charge conference that the doctrine of chances, as charged, allowed the jury to use propensity reasoning. In fact, defense counsel did not challenge any of the specific language of the charge, arguing instead that no instruction on the issue should be given.

Although not central to our decision, we do not accept the dissent's argument that defense counsel objected in the charge conference because the charge allowed propensity reasoning, but used different language. See *post*, ¶¶ 52-53. As we have held, application of the doctrine of chances can rest properly on nonpropensity reasoning that persons use more care when there has been a similar occurrence with bad results. See *supra*, ¶ 23. Defense counsel never separated the permissible inference from the impermissible inference and challenged the latter.

[14] The State argues that any argument that the instruction constituted plain error has been waived because defendant's brief on appeal did not argue it. We reject this argument. See *State v. Yoh*, 2006 VT 49A, ¶ 37, 180 Vt. 317, 910 A.2d 853 ("While most of our cases regarding plain error arise from situations where appellate counsel briefs an issue not preserved below, plain error is also applicable

¶ 10, 176 Vt. 203, 844 A.2d 773 (explaining that objections not properly renewed will be reviewed only for plain error).

■■■ ¶ 41. At the outset, we conclude that the jury instruction on the doctrine of chances did constitute error. First and foremost, we conclude that the instruction, as given, was not a correct statement of the law as explained in this opinion. A jury charge will be upheld "[i]f the charge, taken as a whole and not piecemeal, breathes the true spirit of the law, and if there is no fair ground to say that the jury has been misled." *State v. Gokey*, 136 Vt. 33, 36, 383 A.2d 601, 602 (1978); see also *State v. Rounds*, 2011 VT 39, ¶ 30, 189 Vt. 447, 22 A.3d 477 (holding that permissive-inference instruction constitutes error where it misstates legal rule involved allowing inference to be drawn that is not legally authorized). In this case, the jury instruction did not carefully explain the legitimate and improper use of the doctrine of chances. The instruction did not clearly delineate which of the three different versions of the doctrine was proper and did not specifically instruct that the jury could not use propensity reasoning to determine whether defendant was guilty with respect to a specific fire. Indeed, the jury could have understood that it was permissible to find guilt based on propensity. For example, the instruction states, "The improbability of a coincidence may cause you to conclude that the fires were intentionally set." But this follows only if one infers from the fact that the fires likely were not all accidents to the conclusion that each fire was not an accident — an inference that makes logical sense, but only to the extent one believes human behavior tends to be consistent such that a criminal cause for one fire is likely to explain other fires. This is propensity reasoning. We do not dispute that the evidence of the other fires is relevant and admissible in this case. But we are not convinced that the jury instruction, as given, properly tracked the theory according to which it was admissible.

¶ 42. Second, even if the instruction had clearly delineated which of the versions of the doctrine was proper, the trial court should not have given any instruction on the doctrine of chances. The doctrine of chances is about the admissibility of evidence, which is not generally a matter in which the jury should be instructed. See

when appellate counsel fails to raise an issue, or raises it in an untimely fashion."); see also V.R.Cr.P. 52(b) ("Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court.").

V.R.E. 104(a). It is illuminating that, although the doctrine of chances is a relatively well-worn legal concept, we have not found a single case in which it has been used as a basis for a permissive-inference jury instruction. The concern is that explaining why evidence has been admitted, and the inference that can be drawn from the evidence, risks encouraging the jury to give the evidence additional weight. For this reason, we recently found error in a jury instruction on the admission of evidence in *State v. Brandt*, 2012 VT 73, ¶ 21, 192 Vt. 277, 59 A.3d 141. As in *Brandt*, the charge here specially explained the admissibility ruling, describing to the jury how they could use the evidence. The jury had the evidence of the other fires; there was no reason for the trial court to highlight its potential significance. See *State v. Tahair*, 172 Vt. 101, 108-09, 772 A.2d 1079, 1085 (2001) (emphasizing difference between what jury might infer on its own and what it might conclude when evidence is highlighted by jury instruction).

¶ 43. Having concluded that the instruction constituted error, the question becomes whether it rises to the level of plain error. See *State v. Lambert*, 2003 VT 28, ¶ 13, 175 Vt. 275, 830 A.2d 9 (rejecting argument that flawed jury instruction was error per se). We recently itemized the elements of plain error with respect to a jury instruction:

> Four factors guide our plain error analysis: (1) there must be an error; (2) the error must be obvious; (3) the error must affect substantial rights and result in prejudice to the defendant; and (4) we must correct the error if it seriously affects the fairness, integrity, or public reputation of judicial proceedings. When reviewing possible error in a jury instruction, we examine the instructions in light of the record evidence as a whole and determine if any error would result in a miscarriage of justice. Moreover, we review the instructions in their entirety. If the charge as a whole is not misleading, there is no plain error. This is a very high bar — we find plain error only in rare and extraordinary cases.

*State v. Herrick*, 2011 VT 94, ¶ 18, 190 Vt. 292, 30 A.3d 1285 (citations omitted). In *Rounds*, 2011 VT 39, ¶¶ 32-34, we recently found plain error because of a jury instruction that erroneously allowed the jury to use a permissive inference and misstated the

elements of that inference. We noted that "[t]he instruction as given allowed the jury to look past defendant's theory and infer his criminal intent based on insufficient or nonexistent evidence, all to his direct prejudice." *Id.* ¶ 33. We concluded that the instruction seriously affected the integrity of the jury verdict, noting that "[i]f the jury relied on the erroneous inference in determining the knowledge element of the crime, it failed to find defendant guilty of all elements of the crime beyond a reasonable doubt" and "the instruction provided the jury a path to convict defendant that was not supported by the evidence and was contrary to the statute's dictates." *Id.* ¶ 34.

¶ 44. We cannot find plain error in this case. It is not a rare and extraordinary case. Although the jury instruction could have resulted in prejudice for defendant and a miscarriage of justice, we can only speculate that it did, and, in fact, the jury verdict is consistent with the proper use of the doctrine of chances.

¶ 45. Our main concern with the jury instruction is that it allowed the jury to convict defendant based on propensity reasoning — because of the number of fires, defendant must be an arsonist and, as an arsonist, he intended to start each fire. But the split jury verdict is strong evidence that the jurors did not engage in such reasoning — otherwise they would have convicted defendant for each fire. The acquittal of the charge from the first incident is particular evidence that the jury saw the doctrine correctly, since the psychological doctrine of chances could not be used to create an inference that defendant's act was intentional the first time. Thus, conviction for the latter two fires is in line with the third, and valid, version of the doctrine of chances. It also suggests that the jury was influenced by the State's expert testimony which found a human cause for the last two fires, but not for the first two.

¶ 46. While there are significant similarities between this case and *Rounds*, there are significant differences. In *Rounds*, the permissive inference was statutory, and there was a dispute over whether the basic facts were shown sufficiently to allow the jury to find the inferred intent. We held that Vermont Rule of Evidence 303 required that the basic facts be proved beyond a reasonable doubt when the inferred intent is an element of the offense and the jury instruction failed to require this standard of proof. *Id.* ¶ 27. More importantly, we further held that the key basic fact was not proved beyond a reasonable doubt as a matter

of law so the statutory permissive inference should not have been included in the jury instruction. *Id.* ¶ 29. The errors were of constitutional dimension because the permissive inference allowed the State to prove its case without proof beyond a reasonable doubt. *Id.* ¶ 32.

¶ 47. While we hold here that the court should not have given the permissive-inference instruction, the concern is not of constitutional dimension. Instead, our primary concern is that the jury might have given too much weight to what is properly understood as an evidence-admission rule. Again, the split jury verdict shows that the jury did not give undue weight to the instruction.

*Affirmed.*

¶ 48. **Robinson, J.,** dissenting. I do not contest the majority's thoughtful exposition and organization of the varied applications of the "doctrine of chances," nor its legal conclusions concerning acceptable versus unacceptable inferences in the face of repeated similar incidents. I dissent because I believe the majority's conclusion that defendant did not preserve his objection to the court's doctrine-of-chances instruction is incorrect, and the majority's reliance on a plain error standard is therefore unwarranted. Moreover, given the majority's acknowledgment that the erroneous instruction in this case permitted the jury to draw an impermissible inference regarding defendant's intent (and thus guilt), I cannot agree given the circumstances of this case that the instruction was not plain error.

I.

¶ 49. At the charge conference on the last day of trial, immediately before closing arguments, the trial court presented proposed jury instructions and invited objections. Defendant objected at length to the court's proposed "doctrine of chances" instruction. Distinguishing the various cases upon which the court relied in proposing the instruction, defendant noted that in all of those cases the other incidents supporting the doctrine-of-chances theory were uncharged. The trial court interrupted counsel to ask why that distinction made a difference. Defendant explained that the court's invitation to the jury to infer intent in connection with the four fires "relieves the State of its burden." Counsel continued:

The State has a burden to prove each and every element of each and every crime, and by saying that they can infer from the fact that there were other fires in which Mr. Vuley was not — has not even been proven guilty relieves the State of its burden and you . . . .

¶ 50. The court again interrupted, and defense counsel and the court had multiple backs-and-forths about various other cases. In the course of counsel's attempt to explain again why the proposed instruction was objectionable, the court and counsel had the following exchange:

[DEFENSE COUNSEL]: Well, you — you stated to the jury that the fact that the defendant is charged with a crime is not itself proof of guilt.

THE COURT: Correct.

[DEFENSE COUNSEL]: By — by allowing the Doctrine of Chances in, you're essentially saying the fact that Mr. Vuley is charged with four counts of arson you can infer that — intent from that.

THE COURT: Not true. It's not an accurate statement.

¶ 51. Defendant went on to note other distinctions between cases cited by the trial court and this case. For example, counsel argued that, in one case relied upon by the court, the defendant had admitted to setting a prior fire, and the evidence was admitted because it showed a similar method. The court dismissed defendant's argument, noting that cases are always factually distinct. When counsel argued that the instruction would violate defendant's due process rights, the court responded:

[F]rankly, I think it's very logical which, you know, there's — there's certainly been some evidence of criminal agency at least as — in terms of at least two of these fires, and what the Doctrine of Chances says is that if the jury finds that something has occurred which doesn't occur accidentally very frequently but the evidence shows that it has happened frequently, which I think there's certainly evidence that, in the broad scheme of things, that's the situation here, you can infer a criminal agency from that alone. That's — that's what the Doctrine of Chances says. And on three of these four occasions, Mr. Vuley was home alone.

¶ 52. Defendant further argued:

> Your Honor, I would argue that this — the Doctrine of Chances applies to admission of evidence and doesn't apply to four counts that are pending that the jury has to determine and that the State has the burden of proof, and beyond a reasonable doubt all four . . . .

The court interrupted and said, "Yeah. Okay. Well, we agree to disagree and I'm going to include it. Anything else?"

¶ 53. The parties delivered their closing statements immediately after the charge conference, and the court instructed the jury right after that. At the close of the instructions, defense counsel stated, "Your Honor, I would like to renew my objection to the Doctrine of Chances." Counsel also objected to the court's instruction that defendant claimed that the cause of the four fires was accidental when in fact his position was that it was undetermined.

¶ 54. The majority concludes that defense counsel's renewal of her objection to the instruction was insufficient to preserve the objection pursuant to Vermont Rule of Criminal Procedure 30. Rule 30 requires: "No party may assign as error any portion of the charge or omission therefrom unless [that party] objects thereto before the jury retires to consider its verdict, stating distinctly the matter [objected] to . . . and the grounds of [the] objection."

¶ 55. Defense counsel's extended precharge discussion with the court of defendant's objections to the charge is relevant to our analysis of the preservation question. The majority suggests that the basis for defendant's objection was not clear in the precharge conference. I respectfully disagree. Over the course of counsel's back-and-forth with the court regarding the doctrine-of-chances instruction, filling more than five pages of transcript, defendant repeatedly argued that the instruction allowed the jury to infer defendant's guilt on all four charges on the basis of the fact that there were four charged fires. Although the trial court ultimately cut off defendant's argument by clearly indicating that the discussion was over, it did so only after defendant repeatedly reiterated his objection to the impermissible inference permitted by the court's proposed instruction and the effective elimination of the State's burden of proof as a result. That is the very basis on which the majority now acknowledges the instruction was erroneous.

¶ 56. The majority suggests that defense counsel did not adequately articulate the grounds for defendant's objection because she did not describe the impermissible inferences as "propensity reasoning." *Ante*, ¶ 36 n.13. But "propensity" is a buzzword that describes a certain sort of inference. Defense counsel did one step better than simply stating the buzzword; counsel focused on the impermissible inference described by that term.

¶ 57. The majority contends that defendant's renewal of the objection after the jury instructions was inadequate, and describes the renewal as "cursory" and "buried among other arguments." In fact, the first words out of defense counsel's mouth following the jury instruction were, "Your Honor, I would like to renew my objection to the Doctrine of Chances." Given how little time had passed between defense counsel's extended conversation about this objection with the court — a conversation that was ultimately cut off by the court with a firm indication that the court had heard the objection, understood the objection, and made up its mind — this renewal was more than sufficient to "afford the trial court an opportunity to correct any error or oversight it might have made in the instructions." *State v. Lettieri*, 149 Vt. 340, 342-43, 543 A.2d 683, 685 (1988). The court has such an opportunity where the defendant fully identifies the objectionable issue and the trial court responds to that objection. See *Briggs v. Marshall*, 93 F.3d 355, 359 (7th Cir. 1996) (recognizing defense counsel's "mighty skimpy" on-the-record statement "they are either going to find some money or not," while not best practice, was sufficient to preserve much greater, substantive objections made off record in chambers because it effectuated purpose behind rule "to alert the judge to their reasons for objecting, so that the court may resolve legal disputes with full information and avoid all errors that are avoidable"); *Martell v. Universal Underwriters Life Ins. Co.*, 151 Vt. 547, 552-53, 564 A.2d 584, 588 (1989) (recognizing role of charge conference in informing sufficiency of post-charge objection (citing 9 C. Wright & A. Miller, Federal Practice & Procedure § 2554, at 648 (1971) ("No particular formality is required so long as it is clear that the trial judge was informed of possible errors and was given an opportunity to correct them."))).

¶ 58. The Vermont cases on preservation are not as severe as the majority suggests. We have analyzed two types of Rule 30 cases: those in which the defendant makes no objection at all after the jury charge, and those in which defendant makes a post-

charge objection and the question before us is the sufficiency of that objection to preserve a particular argument. In the former set of cases — those in which a defendant failed to object *at all* after the jury charge — we have consistently found no preservation and have, thus, conducted a plain error analysis.[15] See, e.g., *State v. Myers*, 2011 VT 43, ¶ 18, 190 Vt. 29, 26 A.3d 9 (reviewing jury instruction for plain error due to defendant's failure to "restate his objection per Rule 30"); *State v. Hinchliffe*, 2009 VT 111, ¶ 33, 186 Vt. 487, 987 A.2d 988 (treating failure to object post-charge as waiver of objection); *State v. Schreiner*, 2007 VT 138, ¶ 35, 183 Vt. 42, 944 A.2d 250 (concluding defendant did not preserve issue where defendant failed to object after reading of instruction).

¶ 59. In the latter set of cases, where there has been a post-charge objection, we have deemed the objection preserved except when the objection left ambiguity as to what defendant was asking, when defendant's objection was too general, or when defendant specified a claim of error below different from that argued on appeal. Our guiding principle in such cases has been to serve the goal Rule 30 was designed to advance: to give the trial court "one last opportunity to avoid an error." See *Wheelock*, 158 Vt. at 306, 609 A.2d at 975.

¶ 60. In several cases we have held that defendants' objections were too ambiguous to prompt the appropriate, corrective response from the trial court. See, e.g., *State v. Massey*, 169 Vt. 180, 188-89, 730 A.2d 623, 629 (1999) (describing defendant's post-charge objection as "cryptic," considering what defendant might have meant, and noting that defendant had failed to propose alternative instruction that "would have made his position clear to

---

[15] This Court has only departed from this bright-line rule in a case in which the parties relied upon the trial court's assurance that they need not renew their objections, defendant had made the same objection repeatedly throughout the trial, and the error occurred within two weeks of our decision making it clear that a post-instruction objection is required even in the face of a contrary assurance by the trial court. *State v. Bacon*, 163 Vt. 279, 284-85, 658 A.2d 54, 59 (1995). In *Bacon*, we clarified that despite the judge's instruction in contravention of Rule 30, counsel was obligated to articulate an objection after the charge is read, but treated the objection as preserved given that our decision establishing otherwise in *State v. Wheelock* was only two-weeks old at the time of the *Bacon* trial. See *State v. Wheelock*, 158 Vt. 302, 306, 609 A.2d 972, 975 (1992) (requiring parties provide "succinct recitation of specific itemized objections" despite contrary trial-judge instruction).

the court"); *State v. Crosby*, 124 Vt. 294, 296-97, 204 A.2d 123, 124-26 (1964) (holding that where defendant requested instruction on "the inferences [the jury] may draw," but declined to elaborate on what inferences he had in mind, and refused multiple requests by court for proffered instruction, objection was not preserved). In these cases, this Court has recognized the importance of fairly and reasonably indicating to the trial court "the particulars in which such instructions were claimed to be in error." *Id.* at 297, 204 A.2d at 126. However, there is no indication in either of the above decisions that the thrust of the defendants' objections was apparent on the basis of prior discussions, or that the trial court understood the objections. In these cases, the objections were genuinely nebulous and inadequate to give the court a chance to fix the problem, if any.

¶ 61. This Court has concluded that defendants did not preserve the objections raised on appeal where they only objected generally to the instructions or they objected to *another* aspect of the instructions distinct from their objections on appeal. See *State v. Martin*, 2007 VT 96, ¶ 42, 182 Vt. 377, 944 A.2d 867 ("None of defendant's objections related to the link between defendant's intoxication and the accident, and furthermore we find no general statement of objection to the charge."); *State v. Covino*, 163 Vt. 378, 381, 658 A.2d 916, 918 (1994) (where defendant objected to charge that allowed conviction for kidnapping "by misrepresentation" on grounds that "misrepresentation" is too ambiguous and is not supported by case law, he did not preserve argument that instruction was error because prosecutor charged "kidnapping by force" rather than "kidnapping by inveiglement"); *State v. Valley*, 153 Vt. 380, 398, 571 A.2d 579, 588 (1989) (defendant "bound by the specifics of her objection" at trial, and, therefore, more generalized objection to instruction not preserved for appeal following narrower and more specific objection); *State v. Hicks*, 148 Vt. 459, 464, 535 A.2d 776, 778 (1987) (defendant did not make objection urged on appeal at charge conference or after jury instruction, so objection was not preserved); *State v. Kerr*, 143 Vt. 597, 606-07, 470 A.2d 670, 674-75 (1983) (defendant's general objection inadequate as he never offered additional cautionary instruction urged on appeal, and did not specify error in instruction). All of these cases involved arguments on appeal about jury instructions on grounds not specifically urged below. These cases did not involve objections that were clearly delineated below and

referenced moments later after the jury charge; the trial courts in the above cases did not have sufficient notice of the errors that were subsequently argued on appeal to take timely action to prevent the error.

¶ 62. In contrast, we have found post-charge objections to be sufficient to preserve arguments for appeal when the court understood the specifics of the objection. See, e.g., *State v. Swift*, 2004 VT 8A, ¶ 11, 176 Vt. 299, 844 A.2d 802 (rejecting State's claim that post-charge objection was not sufficiently specific where defendant identified offending language and further stated that issue of credibility — affected by objected-to language — went to heart of defendant's case); *State v. Moffitt*, 156 Vt. 379, 380, 592 A.2d 894, 895 (1991) (rejecting claim that defendant's objection to language in jury instruction was not sufficiently specific where defendant's precharge arguments meant "court knew the exact language defendant wanted and rejected it").

¶ 63. We recently considered a lack-of-preservation argument very similar to this case. We found preserved an objection squarely on point with the one in this case. *State v. Kolibas*, 2012 VT 37, 191 Vt. 474, 48 A.3d 610. In *Kolibas*, defendant was charged with aggravated assault for drugging his minor daughter and her friend. Defendant mounted a mistake defense — he had intended to drug his wife, *not* his daughter and her friend. During the charge conference, defendant opposed any instruction on a theory of transferred intent. After the charge, defendant reiterated the objection, saying, "We object to the instruction of intent regarding the aggravated assault charges, that the State does not have to prove there was an intent to harm a specific individual." On appeal, the State contended that defendant's "objection was not sufficiently detailed to preserve the issue for review under" Rule 30. *Id.* ¶ 12. We found this to be a "detailed objection" clearly preserving the issue for appeal. *Id.* In so concluding, we pointed to the lengthy debate about the issue in the charge conference and to defendant's repeated objections therein.

¶ 64. The majority relies on three cases to support its conclusion. In *Wheelock*, we considered the objection preserved despite defense counsel's failure to object after the reading of the charge because the judge told the parties that all objections made during the charge conference were being preserved and that they need not renew the objections. 158 Vt. at 306, 609 A.2d at 975. In *Wheelock*, we made it clear that a post-charge renewal of objec-

tions is required, even when the trial court says otherwise. Because there was no post-charge objection in *Wheelock*, this Court did not consider the adequacy of the post-charge objection. We described the primary reason for the rule — "to give the trial court one last opportunity to avoid an error." *Id.* We noted that the practice makes our review easier because "objections during a charge conference often are vaguely worded and are interspersed during lengthy discussion," and we often do not have in the record copies of the proposed instructions given to counsel to discuss at the charge conference. *Id.* I agree that *Wheelock* is a pivotal case on this issue, but conclude that the post-charge objection here is the type of "succinct" post-charge objection that is sufficient under *Wheelock*.

¶ 65. The majority also cites a civil case,[16] *Winey v. William E. Dailey, Inc.*, for the proposition that the sufficiency of the stated grounds requires something more than is present here. 161 Vt. 129, 636 A.2d 744 (1993). *Winey* is another failure-to-object case with the twist that the court told the parties that all charge conference objections would be preserved as in *Wheelock*. Plaintiff made a general objection at the end of the two-day, 300-page-transcript charge conference: "And we have stated our basis yesterday. I won't reiterate it now, but I do want to reincorporate now all the arguments I made on those various points and I won't waste the Court's time further." *Id.* at 137, 636 A.2d at 749. We would not accept such a blanket reference as sufficiently specific to preserve the issues for appeal. *Id.* at 138, 636 A.2d at 750. This case is very different. Defense counsel here did not purport to make a general "all-previous-objections" sort of objection; she specifically identified the instruction that was the subject of defendant's objection. The charge conference discussion of the challenged instruction in this case was not buried in a deep, prolonged record distant in time from the renewal of defendant's objection; in this case, the court conducted a charge conference, delivered the jury instructions, and then entertained post-charge objections all in one session, without breaks.

¶ 66. Finally, the majority relies on *State v. Rounds*, another failure-to-object case. 2011 VT 39, 189 Vt. 447, 22 A.3d 477. As in *Wheelock*, this case involved a failure to make any objection at all

---

[16] V.R.C.P. 51(b) is the civil analog to Criminal Rule 30. The relevant text of the rules is virtually identical. Compare V.R.C.P. 51(b), with V.R.Cr.P. 30.

following the jury charge. Defendant conceded his failure to preserve. We reviewed for plain error.

¶ 67. I see no basis in this record for concluding that the trial court did not have ample notice of defendant's arguments, or that if defense counsel had only repeated that the objected-to instruction allowed an impermissible inference of guilt one more time after the charge the trial court would have had more of an opportunity to correct the error. And I believe the majority's opinion stretches Rule 30 beyond our existing case law in a way that does not promote the rule's underlying goals. I cannot join the majority's conclusion that defendant's conviction — and his sentence of five-to-ten years — should stand on the basis of an excessively restrictive application of Rule 30.

## II.

¶ 68. In arguing the preservation point, I do not concede the majority's conclusion that the instruction was not plain error. In this case, the jury could easily have concluded that the repeated fires resulted from defendant's carelessness rather than design given his chronic state of intoxication combined with his smoking habit. The court's instruction called special attention to an alternative, impermissible inference — one that would rest a finding of guilt with respect to a specific fire on impermissible propensity reasoning. This is exactly the kind of instruction we have deemed to be plain error because it effectively allowed the jury to convict without finding defendant guilty of all elements of the crime beyond a reasonable doubt. See *Rounds*, 2011 VT 39, ¶ 32 (court's instruction improperly allowing permissive inference of defendant's intent plain error).

¶ 69. The majority identifies the elements of plain error: error that is obvious, affects substantial rights and results in prejudice, and seriously affects the fairness, integrity, or public reputation of judicial proceedings. *Ante*, ¶ 40. The majority concedes that the instruction was error and does not assert that it was not obvious. The plain error argument seems to falter in the majority's analysis on the questions of whether the error affects substantial rights and results in prejudice to the defendant, and whether it affected the fairness, integrity or public reputation of judicial proceedings.

¶ 70. In assessing prejudice, the majority states, "Although the jury instruction could have resulted in prejudice for defendant and

a miscarriage of justice, we can only speculate that it did, and, in fact, the jury verdict is consistent with the proper use of the doctrine of chances." *Ante*, ¶ 41. We can never know exactly why the jury did what it did, but a defendant need not read the jurors' minds in order to establish plain error. In *Rounds* we found plain error in a jury instruction that improperly permitted the jury to draw an inference about defendant's intent when the State had not established the requisite factors underlying the statutory permissive inference; this Court found prejudice not because we concluded that the jury had in fact impermissibly relied on the improper inference, but on the ground that the court's instruction *allowed* the jury to do so. 2011 VT 39, ¶ 33 ("The instruction as given allowed the jury to look past defendant's theory and infer his criminal intent based on insufficient or nonexistent evidence, all to his direct prejudice.").

¶ 71. Likewise, in *Rounds*, in considering whether the instruction seriously affected the integrity of the jury verdict, this Court wrote:

> By allowing the jury to infer defendant's intent by way of an instruction that should never have been given and failed to announce the proper standard, the jury "*may have relied upon the presumption rather than upon the evidence*" and thus convicted defendant based on a standard less rigorous than the Constitution or the statute at issue require. Because the errors *could have* affected the jury's deliberation, and we cannot know what they decided or how they decided it, we find plain error in this instruction.

*Id.* ¶ 34 (emphasis added). The majority's reasoning here turns this analysis on its head, suggesting that because the instruction may not have influenced the jury, it was not prejudicial.

¶ 72. The majority then goes a step further, offering its own speculation, based on the jury's acquittal in connection with the first two fires, that the jury did not, in fact, use the impermissible propensity-based inference but, rather, invoked what the majority calls the "psychological doctrine of chances." The jury's split verdict is equally consistent with an application of propensity-based reasoning coupled with reasonable doubt with respect to the first two fires because the jury found the alternate explanations for those fires plausible, albeit speculative. The majority is right

that the jury may well have reached its verdict applying reasoning that is fully consistent with the law; but the jury also may well have reached its verdict on the basis of the very impermissible inference the majority so perceptively identifies. The majority's speculation is not a proper basis on which to sustain a conviction in the face of such a critical and conceded error.

¶ 73. In this case, defendant's intent in setting the fires, if the jury concludes he did so, is very much in dispute, and the evidence supports an alternate narrative in which defendant was a causal agent in setting one or more of the fires but lacked the criminal intent necessary to support the conviction. Under these circumstances, the jury instruction inviting the jury to draw an impermissible inference about defendant's intent cuts to the core of this case and creates a serious risk that the jury convicted defendant without finding all the essential elements to convict beyond a reasonable doubt. I do not see how the majority can reconcile its no-plain-error holding with this Court's recent analysis in *Rounds.*